[Crim. No. 44632. Second Dist., Div. Four. June 25, 1984.]

THE PEOPLE, Plaintiff and Respondent, v.
CARMELO SOTO, Defendant and Appellant.

**COUNSEL**

Thomas Kallay, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Howard J. Schwab and Edward T. Fogel, Jr., Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**KINGSLEY, J.**—Upon trial by jury, defendant was convicted of second degree murder with use of a deadly weapon. (Pen. Code, §§ 187; 12022, subd. (b).) He appeals, contending: (1) improper introduction of a confession and the murder weapon, (2) erroneous exclusion of defense evidence, and (3) various errors in the jury instructions. We conclude that the confession was obtained in violation of *Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974], and we therefore reverse.

### FACTS

Sixteen-year-old Rosa Gutierrez was killed on the night of August 20, 1980. Her sisters discovered the body in the family living room at 10:30 p.m. She had been stabbed multiple times in the head and neck, and suffered several more blunt-force trauma wounds. Her clothes had been partially removed. Police noted blood in various areas of the living room.

Police interviewed Rosa's family and friends, including 19-year-old defendant, whom Rosa had mentioned in her diary in an amorous context and whom she had tried to telephone on the night of her death. In the first interview, on the morning of August 21, defendant denied all knowledge of the killing. In a subsequent interview on August 27, he confessed to it, and led the police to an open area near which they found a jagged "rebar" (reinforcement bar used in construction work) which could have caused the blunt force wounds and several of the stab wounds.

In the interview, defendant stated he had stabbed Rosa in the hand, arm, and leg as well as the head and neck; her body, however, displayed no such wounds. Defendant also insisted that the stabbing occurred in Rosa's front yard; although the stab wounds were such as would have caused instantaneous and considerable bleeding, no blood was found outside the house. Defendant repeatedly insisted that Rosa had been wearing pants; in fact she had worn a dress. Defendant accurately described the location in the living room where the body had been left, the fact that it was left partially unclad, and the fact that a knife had been used.

Apart from the confession, no evidence connected defendant with the crime. Examination of the rebar failed to disclose any indication that it had been used as a weapon.

The defense was alibi. Defendant testified that the confession was given falsely in response to badgering by the police, that he had learned of some

of the details of the crime from a newspaper article and Rosa's family, and that he had made up other details.

The jury found defendant guilty after a little more than four full days of deliberation.

## I

Defendant contends that, by repeatedly asking to call his mother during the station house interrogation of August 27, he invoked his constitutional right to remain silent. Therefore, he urges, the trial court should have excluded both the ensuing confession and the rebar which the police were able to locate as a result of the confession.

The trial court concluded that defendant did not invoke his right to silence. Its ruling was based on a tape recording and transcript of the interrogation, and on conflicting testimony about related events which were not taped. We now must accept the version of the conflicting evidence which is most favorable to the People, and examine the tape and transcript of the interrogation, to determine independently whether defendant invoked his Fifth Amendment rights. (*People* v. *Jackson* (1980) 28 Cal.3d 264, 300 [168 Cal.Rptr. 603, 618 P.2d 149].)

Defendant's requests to call home and to speak to his mother occurred late in the interrogation process. First, defendant was interviewed on the morning of August 21 when he was not a suspect in the crime. Then, on the evening of August 26, he was interviewed again and given a lie detector test, which he "failed."[1] The police took defendant home around 11 p.m. on August 26, then picked him up early the next morning for a second lie detector test which he again failed. After this test, defendant was taken to Rosa's grave at his request. According to police testimony, in the police car on the way back to the station, defendant said, "What if I did it, but didn't know what I was doing?" This was defendant's first statement indicating that he may have been involved in the crime. In response, the officer read defendant his *Miranda* rights and said he would talk to defendant about it at the station. Defendant had previously been given, and waived, his *Miranda* rights at the interview of August 26 and at the two lie detector tests. The rights were not again mentioned after the exchange in the police car.

At the station a period of questioning commenced which was tape recorded without defendant's knowledge. In this session (which the parties refer

---

[1] All evidence regarding the lie detector tests was admitted only at the suppression motion, not at the jury trial.

to as the "dream sequence") defendant stated many details of how he had killed Rosa, in the guise of a dream he had had on the night of her death.

The following exchange then occurred:

"OFFICER: I want you to take a drink of your coke Carmelo and take a rest. O.K. Just sit up and relax, take some deep breaths. Drink your coke.

"CARMELO: Can I call home?

"OFFICER: I'm gonna go to the bathroom.

"CARMELO: Can I call my mom—can I call home?

"OFFICER: Yes, just a few minutes. I'll be right back. [Two and a half minute period of silence.]

"OFFICER: How you feeling?

"CARMELO: Can, can I call home?

"OFFICER: Wouldn't you rather wait 'til we're all done?

"CARMELO: No.

"OFFICER: So you can tell her what's going on? What do you want to call her for?

"CARMELO: So I can tell her what happened here.

"OFFICER: Just don't worry about that yet.

"CARMELO: I want to call her right now.

"OFFICER: Wait 'til we get to the truth, the whole truth and nothing but the truth. Tell me something, were you by yourself? I don't want you to cover up anything 'cause I know more or less what happened and I wanta make sure you're telling the truth. Were you by yourself, Carmelo?

"CARMELO: Yes, sir.

"OFFICER: All by yourself? Look up at me and tell me the truth.

"CARMELO: Are you gonna let me call home yet?

"OFFICER: Hun tell me the truth. Were you by yourself?

"CARMELO: Yeah.

"OFFICER: Nobody else with you? What color was the carpet inside Rosa's house. Try to remember. What kind of carpet was it?

"CARMELO: It was regular. It was ah—

"OFFICER: Was it short or long?

"CARMELO: It was long.

"OFFICER: What color was it?

"CARMELO: A red tone with—

"OFFICER: Hun. What you got to worry about right now is telling the truth. That's the only way to do it. You gotta tell the truth. You gotta tell the whole truth. When I write it up it's gonna say you told the whole truth but you gotta prove to me that you're telling the truth.

"CARMELO: I—I—I am telling the truth."

The questioning then continued with defendant alternating between providing more details of the crime, saying he did not remember and was just relating a dream, saying that he was telling the truth, and saying that most of what he had been telling the officer was "bullshit." Several times during this sequence, the original interrogating officer, and another who had joined the session,[2] told defendant that they thought he was covering up for his brother.[3] Defendant's requests to call home were then renewed:

"OFFICER: . . . I think you're covering up for somebody.

"CARMELO: No [indistinguishable.] Something like [indistinguishable] that happened [indistinguishable] I don't know, I don't know how that could have been.

"OFFICER: You said you wanted, you said something about wanting to talk to your mother.

---

[2]Ultimately, three officers questioned defendant jointly.

[3]At the suppression hearing, the first officer testified that all statements regarding the brother were designed to elicit from defendant whether the brother was involved or not. The officers had no information one way or the other.

"CARMELO: Yeah.

"OFFICER: Now why do you want to talk to your mother?

"CARMELO: I just want to tell her where I am. She didn't know I was gonna be gone for—

"OFFICER: You just want to tell her what's happening?

"CARMELO: Yeah.

"OFFICER: You don't want to call her to cover up for somebody?

"CARMELO: No. You guys can be there if you want to. I'm [indistinguishable] going crazy.

"OFFICER: Want me to call her and tell her you're still here and we're still talking to you?

"CARMELO: No.

"OFFICER: You can talk to her later.

"CARMELO: I'll talk to her.

"OFFICER: OK, let's go on.

"CARMELO: Can't I just call her?

"OFFICER: You gonna call her and just tell her where you're at?

"CARMELO: Yes.

"OFFICER: Doesn't she know where you're at?

"CARMELO: Hun.

"OFFICER: Doesn't she know where you're at?

"CARMELO: No, she works out for a while.

"OFFICER: She know you went out though, doesn't she?

"CARMELO: Yeah, I just want to tell her what's happening.

"OFFICER: OK, we'll get to the bottom of this, I'll call her and tell her you're still, we're still talking.

"CARMELO: I don't know, I want to explain to her what happened.

"OFFICER: Well, you explain to us first. We're, I'm, what I'm worried about is that your brother's involved in it.

"CARMELO: He's not involved in this."

The officer's references to defendant's brother, and his to his mother, culminated shortly thereafter:

"OFFICER: You know what you did. I think you're covering up for your brother. I really do. I think you're covering up for your brother.

"CARMELO: My brother was not even with me.

"OFFICER: Then who you covering up for? Somebody else who was with you?

"CARMELO: Nobody, I'm telling you.

"OFFICER: I think we should get the brother now, the brother. Book the brother.

"CARMELO: I'm telling you, if I would of done something like that, you know, ah, it couldn't of been myself, it could not been myself.

"OFFICER: Oh, what a lot of bullshit. You're not gonna tell us who was with you? Screw it. Just go out and get your brother.

"OFFICER: Are you covering up for your brother?

"CARMELO: No. He didn't do it.

"OFFICER: Did he help you?

"CARMELO: No. I didn't even, I don't even think I did it myself to tell you the truth. It, it, you know, somebody had my car, like that, but I did not drive over there myself. I was just, you know, trying to—

"OFFICER: What were you trying to do?

"CARMELO: Hun.

"OFFICER: What were you trying to do? You said you were just trying to—what were you trying to do?

"CARMELO: Ah, I'm just trying to get this over with you know. Another story so you can say 'Ok, let's go home.'

"OFFICER: You want me to do that?

"CARMELO: But—

"OFFICER: Why don't we do that? Let's, ah, we'll think about it.

"CARMELO: Hey, can I call my mother already?

"OFFICER: Not yet."

Subsequently, defendant was placed in a holding cell without being allowed to call his mother. The interrogating officer testified that as he passed the cell a half-hour later, defendant said he was willing to tell the truth. A straightforward confession followed.

The following well-established principles apply to this case. ▪ " 'Once [*Miranda*] warnings have been given, the subsequent procedure is clear. *If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease.* At this point he has shown that he intends to exercise his Fifth Amendment privilege; *any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise.* Without the right to cut off questioning, the setting of in-custody interrogation operates on the individual to overcome free choice in producing a statement after the privilege has been *once invoked.* ' " (Italics in original.) (*People* v. *Fioritto* (1968) 68 Cal.2d 714, 718 [68 Cal.Rptr. 817, 441 P.2d 625]; *People* v. *Parker* (1975) 45 Cal.App.3d 24, 28 [119 Cal.Rptr. 49].)

▪ A suspect invokes his Fifth Amendment privilege by words or conduct that "reasonably appears inconsistent with a present willingness . . . to discuss his case freely and completely with police *at that time.*" (Italics in original.) (*People* v. *Randall* (1970) 1 Cal.3d 948, 956 [83 Cal.Rptr. 658, 464 P.2d 114].) Thus, no particular word-formula is demanded of a suspect to invoke the privilege: "To strictly limit the manner in which a suspect may assert the privilege, or to demand that it be invoked with unmistakable clarity (resolving any ambiguity against the defendant) would

subvert *Miranda's* prophylactic intent. Moreover, it would benefit, if anyone, only the experienced criminal who, while most adept at learning effective methods of coping with the police, is least likely to find incarceration and police interrogation unnerving. Conversely, it would operate most severely on the ignorant and unsophisticated suspect who is most susceptible to the compulsion arising from the tactics of custodial interrogation and consequently most in need of the protections outlined by *Miranda.*" (*Randall, supra,* at p. 955.)

■ There are certain words and conduct that are inconsistent per se with a present willingness to discuss one's case freely and completely with the police. Thus, a request for an attorney automatically invokes the right to have questioning cease. Similarly, it has been held that a minor's request to talk to his parents automatically invokes the Fifth Amendment privilege. (*People* v. *Burton* (1971) 6 Cal.3d 375 [99 Cal.Rptr. 1, 491 P.2d 793]; *In re Patrick W.* (1980) 104 Cal.App.3d 615 [163 Cal.Rptr. 848].) ■ However, no per se rule applies in the situation here, where an adult asks to talk to someone *other* than attorney. In such a case, the court must look to the totality of circumstances surrounding the interrogation to determine whether the request was in fact an invocation of the privilege of silence. (*Fare* v. *Michael C.* (1979) 442 U.S. 707 [61 L.Ed.2d 197, 99 S.Ct. 2560]; *People* v. *Robertson* (1982) 33 Cal.3d 21 [188 Cal.Rptr. 77, 655 P.2d 279].)

■ Under the totality of circumstances in this case, we conclude that defendant's repeated and insistent pleas to call his home, coupled with the officers' responses to him, demonstrate conduct patently inconsistent with defendant's willingness to discuss his case freely and completely with police at the time the pleas were made.

We emphasize that we are not dealing here with the question whether defendant's words or conduct amounted to a request to consult an *attorney.* Rather, the question is whether defendant invoked his right to remain *silent* at that stage of the interrogation when the exchange regarding his requested phone calls occurred. As we have stated, an adult's request to talk to someone other than an attorney may or may not constitute an invocation of the right to stand silent, depending on the circumstances surrounding the request.

We have found one case where the request to talk to a nonattorney has been held to invoke the right to stand silent, and three cases where it has not.

In *People* v. *Parker* (1975) 45 Cal.App.3d 24 [119 Cal.Rptr. 49], the defendant initially refused to talk to police, then upon being re-*Mirandized,*

asked to speak to a prison doctor or psychiatrist. He was allowed to do so; however, the psychologist with whom he spoke then told the police that he had the defendant "ready to make his confession." Without being *Mirandized* again, the defendant confessed. The court held that the initial refusal to speak and the subsequent request to talk to a doctor *both* were "conduct inconsistent with a present willingness to discuss the case freely *at the time* of the questioning." (Italics in original; *id.*, at p. 29.) This case followed the reasoning of *People* v. *Fioritto* (1968) 68 Cal.2d 714, 718 [68 Cal.Rptr. 817, 441 P.2d 625].

The three cases finding no invocation of the right to remain silent are distinguishable from the present case.

In *Fare* v. *Michael C.*, *supra*, 442 U.S. 707, the defendant, after being *Mirandized*, asked to speak to his probation officer. The request was apparently made but once. In response, he was told that the request could not be honored, but he was again fully *Mirandized*, i.e., was told that he was under no compulsion to speak and that, although he could not consult his probation officer, he could consult an attorney instead. The defendant responded by waiving his *Miranda* rights. The Supreme Court found that under the totality of circumstances, the defendant's request had not amounted to an attempt to remain silent. The court noted that the defendant had considerable prior experience with police, and was not worn down by lengthy questioning, improper interrogation tactics, or any trickery or deceit.

In *People* v. *Barrow* (1976) 60 Cal.App.3d 984 [131 Cal.Rptr. 913], the defendant, in response to *Miranda* warnings, asked if he could phone his employer. The police said no, but repeated that he "certainly" had the right to phone an attorney. The defendant responded by waiving his *Miranda* rights. The court held that his one-time request to call his employer, under the circumstances, was not an invocation of the right to remain silent.

Finally, in *People* v. *Robertson*, *supra*, 33 Cal.3d 21, the defendant's one-time request to talk to his psychologist was found not to invoke his right to silence where the police tried unsuccessfully to reach the psychologist, asked the defendant if he nonetheless was willing to talk to them about the crime, the defendant stated he was willing, and *Miranda* rights were then given and waived. In addition to the foregoing circumstances which demonstrated "absolutely no evidence of any coercion" (*id.*, at p. 40), the court noted that the defendant had invoked his *Miranda* rights on past occasions and therefore presumably knew how to do so if he wished.

Several facts stand out from these cases. In each of them, the request to talk to someone rather than an attorney was not made repeatedly or with

any degree of insistence. In each of them, the defendant, *after* making the request, was told that he nonetheless retained his right to consult an attorney and to refuse to submit to questioning. In each of them, the defendant waived his *Miranda* rights after being so readvised. In *Fare* and *Robertson,* the courts found it significant that the defendants were experienced in police procedures, i.e., should not be deemed within the class of "ignorant and unsophisticated suspect[s] who [are] most susceptible to the compulsion arising from the tactics of custodial interrogation and consequently most in need of the protections outlined by *Miranda.*" (*People* v. *Randall, supra,* 1 Cal.3d 948, 955.) Finally, in *Fare* and *Robertson* the courts noted the absence of any improper police tactics or hint of coercion; from the limited discussion in *Barrow,* it similarly appears that no improper tactics were used. Under the circumstances of these cases, it appears clear that the defendants were not forwarding their request to talk to someone as a means of seeking to avoid interrogation.

The same cannot be said of defendant's requests in the instant case. We find the following factors significant here:

(a) The requests were repeated and insistent. Defendant having first asked to call his home, renewed the request at length after a two and half-minute interval in which he was free to consider his situation and decide what he wanted to do about it. He later reiterated the request, insisting that he wanted to talk to his mother himself, as he was "going crazy" rather than allowing the officer to call for him. Still later, despite the indications that it would be futile to do so, he tried to obtain permission a fourth time. Unlike *Fare, Barrow,* and *Robertson,* it is apparent that this was no casual or lightly felt request. Indeed, the depth of defendant's feeling is demonstrated in his remark, "I wish I were fuckin' dead," made shortly after his second series of requests was denied with the injunction that he must tell the "whole truth" before he would be allowed to contact his mother.

(b) At several points in the exchanges, defendant's choice of words strongly appears to indicate his present unwillingness to continue responding to questions "at th[ose] time[s]." (*People* v. *Randall, supra,* 1 Cal.3d at p. 956.) Thus, when the officer asked if defendant would not rather wait until the questioning was completed, defendant unequivocally stated "No." He then said, "I want to call her *right now.*" (Italics added.) When the next question was posed to him about his involvement in the crime, rather than answer it he asked, "Are you gonna let me call home yet?" Subsequently, when the officer told defendant he could talk to his mother "later," and indicated that the interrogation would meanwhile "go on," defendant resisted any postponement of the call, saying "Can't I just call her?" and "I want to explain to her what happened." Unlike the situation in *Fare, Bar-*

*row,* and *Robertson,* these exchanges cannot support a reasonable inference that defendant was freely willing to go on with the interrogation whether or not his request was honored.

(c) The officers' responses to the requests tend to indicate that defendant had irrevocably waived his right to remain silent and had no choice but to continue answering questions until the whole truth was out. During the first series of requests, defendant was told he could not call home until "we get to the truth, the whole truth and nothing but the truth"; in the same vein, "You gotta tell the truth. You gotta tell the whole truth. When I write it up it's gonna say you told the whole truth but you gotta prove to me that you're telling the truth," and "[Y]ou explain to us *first.*" (Italics added.) ■ It is true that *Miranda* does not require an admonition that a defendant who submits to custodial interrogation, unlike one who submits to direct examination in court, retains his right to stand silent at all times regardless of an initial waiver. However, such a right *does* survive an initial waiver in the interrogation context under *Miranda,* and, indeed, can be invoked at *"any time . . .* during questioning." (Italics added.) (*Miranda* v. *Arizona, supra,* 384 U.S. at p. 474 [16 L.Ed.2d at p. 723].) The vice of the officers' responses in the instant case, particularly the legalistic incantation of "the truth, the whole truth and nothing but the truth," is that they imply that the law required defendant's continued and complete submission before any outside assistance could be obtained. Under these circumstances, a finding that defendant freely and knowledgeably assented to go on with the questioning absent outside assistance cannot be lightly made.

■ (d) No *Miranda* warnings were given, and no waiver expressed, after the requests were made. This factor is another that distinguishes the present situation from *Fare, Barrow* and *Robertson.* Although those cases do not require re-*Mirandization* after a suspect asks to speak with a nonattorney, we think that such subsequent admonition and waiver become near mandates in situations where, as here, the interrogating officers imply that the right to stand silent has been irrevocably lost.

(e) The officers parried defendant's requests with the accusation that his requests were simply an attempt to suppress evidence against his brother. It has been held that where "a confession is coerced by a threat to arrest a near relative, it is not admissible." (*People* v. *Rand* (1962) 202 Cal.App.2d 668 [673] [21 Cal.Rptr. 89]; see also, *People* v. *Mellus* (1933) 134 Cal.App. 219 [25 P.2d 237].) We do not reach the question (separately raised in defendant's brief) whether the references to defendant's "covering up" for his brother, combined with the remarks, "I think we should get the brother now, the brother. Book the brother[4] . . . Just go out and get your

---

[4]The tape records sniffling and crying sounds at the point, inter alia, where the "book the brother" remark was made.

brother" amount to coercion rendering defendant's subsequent statements inadmissible. We evaluate this evidence only as part of the totality of the circumstances.

(f) Defendant was inexperienced with police and otherwise somewhat unsophisticated. The "totality of circumstances" test mandated by *Fare* includes an inquiry into the defendant's personal characteristics, including his sophistication in criminal matters. Here the record indicates that defendant had not before been arrested or exposed to custodial interrogation, that he still lived with his mother, and that, according to psychiatric testimony, he was immature for his age. We think the transcript and tape of the interrogations, in light of the fact that defendant was unaware that the proceedings were being recorded, eloquently attest to immaturity. These factors are certainly far from dispositive; however we take them into account in determining whether *this particular* defendant's requests to call home and speak to his mother were an attempt to avoid continued interrogation.

(g) The questioning was lengthy, and involved deceit. Both *Fare* and *Robertson* indicate that any coercive aspects of the interrogation procedure should be taken into account in determining whether a request to talk to a nonattorney amounts to an invocation of the right to silence. Again, although not dispositive by any means, it is significant here that defendant had been in the exclusive company of police for over four hours when his requests were made, and that the police had indicated to him, deceitfully, that his and his brother's fingerprints had been found in Rosa's house, that they had knowledge that his relationship with her was more involved than he was admitting, and, apparently, that his car had been seen by her house at the time of the crime.

Taking all of these circumstances into account, it appears inescapable that defendant's requests to telephone home and speak to his mother constituted conduct "reasonably inconsistent with a present willingness . . . to discuss his case freely and completely with police." In *Fare* the Supreme Court recognized that there are some circumstances in which such requests are tantamount to an invocation of the privilege against self-incrimination. If such an invocation is not shown where the requests are persistent, they are made in lieu of answering pending questions, the defendant is given to understand that he must satisfy his interrogators by giving them the "whole truth," he is not told that he retains the right to cut off questioning, he is accused of making his request in order to suppress evidence, threats are made to arrest his relative, he is a young adult of manifest immaturity with no evidence of possession of the experience or sophistication that would indicate he knows how to clearly and unequivocally invoke his constitutional rights, he is not removed from the protective ambit of the parent he seeks

to contact, and he has been exposed to deceptive police tactics, then the rule of *Fare* would be effectively meaningless. We hold that defendant invoked his right to remain silent at the time his requests were made.

The Attorney General urges that we should not extend the per se rule of *Burton* to adults. We make no such extension. We do not hold that an adult's request to call his home or to speak to his parents is a per se invocation of his Fifth Amendment rights. Rather, we have applied the totality rule of *Fare* to find that by these requests this defendant invoked his right to silence under the particular circumstances of this case.

The Attorney General also argues that defendant sought merely to tell his mother where he was and what he had been doing rather than to seek her counsel or to attempt to cutoff questioning. As we have noted, however, such an interpretation is belied by the record.

The consequences of our holding are as follows:

First, all statements elicited from the defendant after his initial requests were, and are, inadmissible. The Attorney General does not suggest, and we are unwilling to find, that defendant's subsequent "offer" to tell the truth was other than an involuntary product of the officers' failure to honor his Fifth Amendment invocation. On the contrary, when a defendant is told he must tell the whole truth before he can get outside assistance and on pain of his brother being booked, it is natural that he would respond in just the way this defendant did, by ultimately acceding to the officers' demands.

The rebar, however, was properly admitted, as it was not a product of the statements elicited after defendant's requests were made. Defendant had already given the rebar's rough location in the prior dream sequence, and his subsequent affirmation of the location was essentially repetitive. Furthermore, defendant's later on-the-scene assistance was apparently unnecessary to the rebar's recovery. An officer found it 50 yards away from the location defendant had described, while defendant was looking with other officers elsewhere. Under those circumstances, the rebar was not the fruit of the unlawfully obtained statements. (*Wong Sun* v. *United States* (1963) 371 U.S. 471 [9 L.Ed.2d 441, 83 S.Ct. 407].)

Finally, the conviction must be reversed and a new trial had. The jury essentially heard two confessions (albeit the first one couched variously as a "dream" and "bullshit"),[5] one taken prior to defendant's invocation of

---

[5]We make no finding as to whether the "dream sequence" technically constituted an admission rather than a confession.

the right to remain silent and the other taken subsequently. ■ Absent the most unusual of circumstances, the erroneous introduction of a confession is reversible error per se, regardless of the magnitude of other evidence of guilt. (*People* v. *Fioritto, supra,* 68 Cal.2d 714; *People* v. *Nicholas* (1980) 112 Cal.App.3d 249 [169 Cal.Rptr. 497].) Here the two confessions were virtually the only evidence connecting defendant with the crime. The People did not persuasively explain why various of defendant's incriminating statements were inconsistent with the physical evidence. A psychiatric witness testified, without impeachment, that defendant's personal characteristics, combined with the interrogation techniques used, might make him confess falsely. Two of defendant's most damning admissions, his accurate description of the body's state of undress and location in the living room, were made during the second, improperly introduced confession. The jury, notwithstanding introduction of the second confession, apparently had some difficulty with this one-count case, requiring three full days, two half-days, and part of a sixth day to decide it. Under these circumstances, we cannot say beyond a reasonable doubt that the jury's decision was unaffected by the introduction of the second—and the only straightforward—confession. We are compelled to, and do, reverse.

II

Aside from the introduction of the confession, we find no other errors in the rulings which defendant challenges:

■ (a) It was proper for the court to instruct on diminished capacity and to define implied malice as that state of mind shown by an act "involving a high degree of probability that it will result in death, which act is done for a base, antisocial purpose and with a wanton disregard for human life *by which is meant an awareness of a duty imposed by law not to commit such acts followed by the commission of the forbidden act despite that awareness.*" (CALJIC No. 8.11 (1979 revision); CALJIC 8.31 (1974 revision), italics added.)

The underscored portion of this definition is consistent with, and gives effect to, the diminished capacity defense to malice. We therefore think it plain that where diminished capacity instructions are given in a murder case, as they were below, then the above-quoted definition of malice must be given along with them. Defense counsel *requested* instruction per CALJIC No. 8.77, which sets forth the diminished capacity defense to first degree murder, second degree murder, and voluntary manslaughter; moreover, when the trial court began to give a malice instruction that omitted the diminished capacity language underscored above (CALJIC No. 8.11 (1982 revision)), counsel interrupted the court and indicated that the 1979 version

of the instruction should be given instead. In view of the portions of defendant's statements where he claimed to be under the influence of marijuana during the crime, to have gone crazy and not known what he was doing and to have still been under the influence the next morning, it would have been error for the court to refuse his requests to instruct on diminished capacity and the corresponding definition of implied malice. Defendant cannot have it both ways.

If the evidence warrants them, and defendant does not object, the same instructions should be given on retrial.[6] ■ Although the diminished capacity defense has since been repealed by act of the Legislature and initiative of the People, the defense was fully in effect on the date of the charged crime. Under the ex post facto clauses of the California and federal Constitutions, these subsequent repeals can have no effect on this case. (See *People* v. *Smith* (1983) 34 Cal.3d 251, 261, fn. 4 [193 Cal.Rptr. 692, 667 P.2d 149].)

■ (b) The trial court correctly excluded evidence that Rosa belonged to a gang when defendant first met her (more than a year and half before the crime) and that defendant had heard "rumors" that the killing was done by a gang. The court ruled, and we agree, that this evidence was more prejudicial than probative, and that the "rumor" evidence was inadmissible hearsay.

A defendant is entitled to show, by competent and substantial evidence, a probability that someone other than he committed the crime charged to him. However, "evidence which simply affords a *possible* ground of suspicion is generally excluded as unduly prejudicial." (Italics added.) (*People* v. *Guillebeau* (1980) 107 Cal.App.3d 531, 549 [166 Cal.Rptr. 45]; *People* v. *Whitney* (1978) 76 Cal.App.3d 863, 869-870 [143 Cal.Rptr. 301].) The bare fact that defendant heard rumors is so vague and tenuous as to fail to evidence even a reasonable possibility that someone else committed the crime. The speculation that such evidence would engender outweighs its minimal probative value. Moreover, the shred of relevance which this evidence possesses is wholly dependent upon the rumors being true. Thus the evidence was offered to prove the truth of the matter asserted in the rumors and hence was inadmissible hearsay. (Evid. Code, § 1200.)

Rosa's prior gang membership was of no relevance whatsoever. Even if she had belonged to a gang at or near the time of her death, that fact alone would have no tendency in reason to prove the identify of her killer. "Mem-

---

[6]If diminished capacity does *not* become an issue on retrial, however, then the most recent versions of CALJIC Nos. 8.11 and 8.31 could be properly given.

bership in an organization [including a gang] does not lead reasonably to any inference as to the conduct of a member on a given occasion." (*People v. Perez* (1981) 114 Cal.App.3d 470, 477 [170 Cal.Rptr. 619].) It follows plainly that one's membership in a gang can hardly lead reasonably to any inference as to the conduct of *other* members on a given occasion.

(c) The court properly gave CALJIC No. 8.74[7] at the outset of deliberations and properly decided to give CALJIC No. 8.75 only if and when the jury reached a deadlock. The same procedure can be used on remand.

CALJIC No. 8.75 was formulated in response to *Stone v. Superior Court* (1982) 31 Cal.3d 503 [183 Cal.Rptr. 647, 646 P.2d 809]. ▮ The instruction is designed to give effect to a jury's decision to acquit the defendant of a crime when the jury is deadlocked as to a lesser included crime. Its purpose is not to afford the defendant any protection in the trial in which the instruction is given, but to protect him against being tried *subsequently* for a crime of which a jury has already unanimously agreed that he is innocent.

Thus, although a court *can* give CALJIC No. 8.75 at the outset of deliberations in anticipation of a possible deadlock on a lesser included offense, it can alternatively wait to see whether such deadlock occurs and give the instruction only if and when it does. (See *Stone* at pp. 519-520; "Use Note" to CALJIC No. 8.75.) Furthermore, even if it were error to reserve the instruction until deadlock, and even if a deadlock had occurred in this case, no conceivable prejudice would arise until refiling of the charge.

Finally, it is true that *Stone* "disapproved" of CALJIC No. 8.74 (31 Cal.3d at p. 519, fn. 8), but only insofar as that instruction implies that a jury cannot acquit on a greater offense unless it reaches unanimous agreement on lesser included offenses. Here, since the jury reached unanimous agreement on the lesser included offense of second degree murder, any such implication was of no consequence. As for whether the instruction should be given on retrial, we agree with the "comment" to CALJIC No. 8.74 that any ambiguity or uncertainty embodied in the instruction is cured by CALJIC No. 8.75. Since such ambiguity or uncertainty relates only to the jury's duties upon reaching a deadlock, it seems entirely appropriate to give CALJIC No. 8.74 as long as it is supplemented with 8.75 in the event of a deadlock.

---

[7]CALJIC No. 8.74 provides: "Before you may return a verdict in this case, you must agree unanimously not only as to whether the defendant is guilty or not guilty, but also, if you should find him guilty of an unlawful killing, you must agree unanimously as to whether he is guilty of [murder of the first degree] [or] [murder of the second degree] [or] [[voluntary] [or] [involuntary] manslaughter]."

The judgment is reversed and remanded for a new trial.

Woods, P. J., and McClosky, J., concurred.