[No. F006854. Fifth Dist. Oct. 23, 1987.]

THE PEOPLE, Plaintiff and Respondent, v.
VIVIAN GAYLE GIBSON, Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

---

*Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication with the exception of parts II, IV and V.

842

**COUNSEL**

Frank O. Bell, Jr., State Public Defender, under appointment by the Court of Appeal, and Sandra Gillies, Deputy State Public Defender, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, J. Robert Jibson and William G. Prahl, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**BALLANTYNE, J.—**

### STATEMENT OF THE CASE

Defendant, Vivian Gayle Gibson, was charged with violating Penal Code section 187, murder. It was further alleged that she personally used a firearm during the commission of the offense within the meaning of Penal Code section 12022.5.

Prior to trial defendant made a motion to quash subpoenas issued for certain bank records claiming that the issuance of the subpoenas did not comply with Government Code section 7476. The motion was denied.

Defendant proceeded to a jury trial and was found guilty of first degree murder. It was further found that she personally used a firearm during the commission of the offense. Defendant was sentenced to prison for a term of 27 years to life.

### STATEMENT OF FACTS

Defendant and Sarah Bettye Smith (hereinafter Sarah) entered into a lesbian relationship in February of 1982. On May 11, 1985, defendant and Sarah were living together in a mobilehome when defendant shot and killed Sarah.

Defendant met Sarah when she (defendant) left her husband because he had been beating her. They lived together for a short time when Sarah sold her house and they moved to Washington to get away from defendant's husband. After living in Washington for a short period of time, the two decided to move back to Modesto. At this time defendant lived with her husband for three days. Things did not work out and defendant returned to Sarah. Sarah bought a mobilehome some time in 1982. It was placed in both defendant's and Sarah's names. In 1983 Sarah purchased a home rental business. She gave defendant $12,500 to contribute to the business so they could be 50-50 partners. The business went sour in six weeks and defendant and Sarah lost their $25,000 investment.

In November of 1983 defendant and Sarah started a janitorial service called Rainbow Cleaning. Sarah opened an account for that business in 1983. Defendant's name was added to this account as a cosigner in March 1984.

In late 1983 defendant decided to move out of the mobilehome so that she could try to stop drinking. Prior to doing this defendant obtained $4,000

from a bank card in Sarah's and defendant's names. Even though defendant moved out, Sarah and defendant continued to see each other and Sarah wanted defendant to move back. During this time Sarah removed defendant's name from the cleaning business account and from the ownership papers for the mobilehome.

Defendant moved back in with Sarah. Defendant's name was added back to the cleaning business account and the mobilehome papers. Sarah and defendant argued frequently, usually about their drinking. In the early spring of 1985, during a fit of anger with Sarah, defendant used the bank card to obtain $1,700. This in turn caused Sarah to become very angry, and defendant gave Sarah the money back.

The day before Sarah's murder she and defendant each changed their individual checking accounts into joint checking accounts.

On May 11, 1985, defendant and Sarah started drinking earlier than usual. Sarah called Rubalee (a former lover of defendant's) shortly after 4 p.m. Sarah asked Rubalee to talk to the defendant because defendant was upset and waving a gun around. Rubalee talked to defendant and asked her what was wrong. Defendant told Rubalee she was going to kill everyone who was interfering with her life. Rubalee heard Sarah tell the defendant to go ahead and hit me. Rubalee heard a pop and then the phone went dead.

Defendant called her sister, Virginia Fisher, and said that Sarah had been shot. Virginia told her to dial 911 and summon help. At approximately 4:30 p.m., Deputy Antone arrived at the mobilehome to investigate a possible shooting. Defendant came out of the house and waved Deputy Antone inside. Deputy Antone tried to identify Sarah's injuries and asked defendant if she had been shot. Defendant said, "Yeah, we got into a drunken argument and I shot her." While Deputy Antone attempted to help Sarah, he saw defendant reach for the gun. Deputy Antone grabbed the gun away from her.

The paramedics arrived and one of the paramedics asked defendant what happened. She replied that she and Sarah had been arguing and drinking all day. Defendant got fed up with it and shot Sarah.

Defendant was placed under arrest and was given a blood test at approximately 6:45 p.m. Her blood-alcohol level was .15. It could have been between .18 and .21 at 4:30 p.m. that day.

The sheriff detectives found a bullet hole in the paneling of the mobilehome. It also looked as if a projectile had hit the television set.

Sarah died at the hospital that evening from a bullet wound which entered her back and exited her abdomen.

Defendant testified that she did not remember anything that happened that day until about 45 minutes prior to the accident. Defendant was angry with Sarah for calling Rubalee. Defendant stated she did not talk to Rubalee when Sarah phoned her. Defendant remembers firing a gun through the house. Defendant stated that about a year before she shot the gun off in the house when she was drunk.

Joy White testified that in 1983 Sarah asked her over to the mobilehome and showed her some holes in the wall. A defense investigator found some holes in the wall of the mobilehome.

DISCUSSION

I.

## DOES THE GIVING OF CALJIC NO. 8.75 AS PART OF THE GENERAL INSTRUCTIONS PRECLUDE THE JURY FROM CONSIDERING THE CHARGES AS A WHOLE?

The trial court instructed the jury pursuant to CALJIC No. 8.75 as follows: "In this case, defendant VIVIAN GAYLE GIBSON is charged with the offense of murder. Murder is divided into two degrees—murder in the first degree and murder in the second degree. Voluntary manslaughter and involuntary manslaughter are lesser and necessarily included offense[s].

"The court will provide you with verdict forms for the charge and for each lesser and necessarily included offense. You should determine whether defendant is guilty or not guilty of the offense of first degree murder and any special finding you are directed to make. If you unanimously agree that defendant is guilty of said offense and any special finding you are directed to make, you will have your foreman date and sign the guilty verdict [and return with it into court]. Nothing further will be then required of you.

"If you unanimously agree that defendant is not guilty of murder in the first degree, you will have your foreman date and sign the not guilty verdict of the offense of murder in the first degree and you will determine whether defendant is guilty or not guilty of murder in the second degree, and any special finding you are directed to make. If you unanimously agree that defendant is guilty of the offense of murder in the second degree, and any special finding you are directed to make, you will have your foreman date and sign the guilty verdict of murder in the second degree and nothing further will be required of you as to the offense of murder. If you unanimously agree that defendant is not guilty of the offense of murder in the

second degree, you will have your foreman date and sign the verdict not guilty of murder in the second degree and you will determine whether defendant is guilty or not guilty of the lesser included offense of voluntary manslaughter or said lesser included offense of involuntary manslaughter and any special finding you are directed to make, you will have your foreman date and sign such guilty verdict and return it into court together with the not guilty verdict on the offense of first degree murder and second degree murder.

"You will note from this instruction that you must unanimously agree that the defendant is not guilty of first degree murder before you may find defendant guilty or not guilty of second degree murder. If you are unable to unanimously agree on the charge of first degree murder, your foreman shall report such fact to the court.

"You must unanimously agree that defendant is not guilty of second degree murder before you find him guilty or not guilty of [voluntary or involuntary] manslaughter.

"If you unanimously agree that defendant is not guilty of the offense of first degree murder and second degree murder, but after due and sufficient deliberation you cannot agree that defendant is guilty or not guilty of either voluntary or involuntary manslaughter, your foreman shall report such fact to the court and then return to the court the signed not guilty verdict of the offense of first degree murder and second degree murder.

"You will note from this instruction that if you unanimously agree that defendant is not guilty of the offense of first degree murder and second degree murder, you must have your foreman date ansd [sic] sign such verdicts and return them into court regardless of what may happen in your deliberations on any lesser included offenses of voluntary manslaughter and involuntary manslaughter."

This instruction was formulated in response to *Stone* v. *Superior Court* (1982) 31 Cal.3d 503 [183 Cal.Rptr. 647, 646 P.2d 809]. In *Stone,* the defendant was charged with murder. "The jury was instructed on first degree murder, second degree murder, voluntary manslaughter, and involuntary manslaughter." (*Id.* at p. 507.) After lengthy deliberations, the jury was unable to reach a unanimous guilty verdict on any of the possible verdicts. An inquiry was made and it was discovered that all the jurors agreed the defendant was not guilty of first or second degree murder. (*Ibid.*)

The trial court declared a mistrial but refused to dismiss the first and second degree murder charges. The defendant appealed claiming that the

jury acquitted him of the murder charge and therefore double jeopardy would prevent his retrial for murder. (*Id.* at p. 509.)

The Supreme Court held, "the trial court is constitutionally obligated to afford the jury an opportunity to render a partial verdict of acquittal on a greater offense when the jury is deadlocked only on an uncharged lesser included offense. Failure to do so will cause a subsequently declared mistrial to be without legal necessity." (*Id.* at p. 519.)

The Supreme Court suggested the following procedures for meeting the above obligation: "When a trial judge has instructed a jury on a charged offense and on an uncharged lesser included offense, one appropriate course of action would be to provide the jury with forms for a verdict of guilty or not guilty as to each offense. The jury must be cautioned, of course, that it should first decide whether the defendant is guilty of the greater offense before considering the lesser offense, and that if it finds the defendant guilty of the greater offense, or if it is unable to agree on that offense, it should not return a verdict on the lesser offense.

"Alternatively, the court may decide to wait and see whether the jury is unable to reach a verdict; if it is, the court should then inquire whether the jury has been able to eliminate any offense. If the jury declares itself hopelessly deadlocked on the lesser offense yet unanimous for acquittal on the greater offense, and the court is satisfied that the jury is not merely expressing a tentative vote but has completed its deliberations, the court must formally accept a partial verdict on the greater offense. It is within the discretion of the court to order further deliberations if it perceives a reasonable probability that a verdict will be reached that will dispose of the entire proceeding." (*Id.* at pp. 519-520.)

■ Defendant asserts that this instruction impermissibly prescribes the jury's agenda and tells the jury that it cannot consider a lesser charge until it unanimously agrees the defendant is not guilty of the greater charge. Defendant argues that the instruction violates due process because it orders "deliberations to begin with the most culpable offense and to remain with that offense unless and until the jury can unanimously agree that the defendant is not guilty of that charge."

Citing *People* v. *Soto* (1984) 157 Cal.App.3d 694 [204 Cal.Rptr. 204], defendant asserts that in the interest of fairness it is proper to withhold reading this instruction until a deadlock has been announced. In *Soto,* the appellate court held that the trial court acted properly in deciding to give CALJIC No. 8.75 only if and when the jury reached a deadlock. (*Id.* at p. 713.) The court stated: "[A]lthough a court *can* give CALJIC No. 8.75 at the outset of deliberations in anticipation of a possible deadlock on a lesser

included offense, it can alternatively wait to see whether such deadlock occurs and give the instruction only if and when it does." (*Ibid.*)

The trial court in the instant case followed the first approach suggested by *Stone, supra,* 31 Cal.3d 503. The Supreme Court in *Stone* clearly said that the jury "should first decide whether the defendant is guilty of the greater offense before considering the lesser offense, and that if it finds the defendant guilty of the greater offense, or if it is unable to agree on that offense, it should not return a verdict on the lesser offense." (*Id.* at p. 519.) CALJIC No. 8.75 conforms to this suggested procedure. This court is bound by the Supreme Court holding in *Stone*. (*Auto Equity Sales, Inc.* v. *Superior Court* (1962) 57 Cal.2d 450 [20 Cal.Rptr. 321, 369 P.2d 937].)[1]

Although CALJIC No. 8.75 certainly sets forth a sequence which the jury must follow when making its final determination of guilty, it does not, as defendant suggests, preclude the jury from considering all of the facts as they relate to the lesser offenses. Verdicts involving a charged offense and uncharged necessarily-included offenses by their nature require the jury to consider all of the evidence to determine if the defendant is guilty of the charged offense. In determining that defendant is guilty of the greater offense, the jury must have necessarily rejected that evidence which could have negated one of the elements of the greater offense. For example, in order to find defendant guilty of first degree murder, one of the elements the jury had to find was that the defendant harbored malice at the time of the killing. In order to have found malice, the jury must have rejected the evidence which supported a finding that the defendant was too intoxicated to have formed malice aforethought.

The giving of CALJIC No. 8.75 does not skew the jury's factfinding process. It merely delineates a logical and natural sequence for the jury to follow once the facts have been discussed and determined. The jury was instructed that it was their duty to determine the facts. They were told to consider the instructions as a whole. They were also instructed as follows.: "I have not intended by anything I have said or done, or by any questions that I may have asked, or by any ruling I may have made, to intimate or suggest what you should find to be the facts on any questions submitted to you, or that I believe or disbelieve any witness.

"If anything I have done or said has seemed to so indicate, you will disregard it and form your own opinion.

---

[1] Under the language of *Stone* and CALJIC No. 8.75, the result is the People have an absolute right to either a unanimous conviction or acquittal on the greater crime before a verdict of any kind can be returned on the lesser crime. We ponder whether justice might be better served by having the jury return a unanimous verdict on a lesser crime without having unanimously agreed on an acquittal of the greater charge, thus avoiding the costly and laborious task of declaring a mistrial and trying the entire matter anew.

"You have been instructed as to all the rules of law that may be necessary for you to reach a verdict. Whether some of the instructions will apply will depend upon your determination of the facts. You will disregard any instruction which applies to a state of facts which you determine does not exist. You must not conclude from the fact that an instruction has been given that the court is expressing any opinion as to the facts.

"Both the People and the defendant are entitled to the individual opinion of each juror.

"It is the duty of each of you to consider the evidence for the purpose of arriving at a verdict if you can do so. Each of you must decide the case for yourself, but should do so only after a discussion of the evidence and instructions with the other jurors.

"You should not hesitate to change an opinion if you are convinced it is erroneous. However, you should not be influenced to decide any question in a particular way because a majority of the jurors, or any of them, favor such a decision."

By following these instructions it can be assumed that the jury considered all of the facts and charges and did not place special emphasis on the first degree murder charge merely because the trial court gave CALJIC No. 8.75.

In *People* v. *Zwiers* (1987) 191 Cal.App.3d 1498 [237 Cal.Rptr. 123], the defendant challenged CALJIC No. 17.10, the lesser-included-offense instruction for crimes other than murder. (*Id.* at p. 1499.) Relying on *Stone* v. *Superior Court, supra,* 31 Cal.3d 503 and numerous out-of-state authorities, the court concluded that the acquittal-first instruction was constitutional. (*Id.* at p. 1506.)

"The instruction does not compel the jury to adopt an all-or-nothing approach to the issue of guilt, as appellant suggests; the jury knows that it may convict a defendant of a lesser offense if it acquits him or her of the greater offense. Minority jurors who are convinced of a defendant's innocence will cause a jury to hang, which is a 'safeguard to liberty' and 'the sole means by which one or a few may stand out against an overwhelming contemporary public sentiment.' [Citations.] The fact that jurors in the minority may vote to convict on the greater offense rather than cause a hung jury does not compel us to invalidate the instruction; the instruction guards against unwarranted verdicts." (*Ibid.*)

CALJIC No. 8.75 does not impermissibly invade the jury's factfinding process. There was no error in giving the instruction.

## II.*

### WHEN THERE IS EVIDENCE OF INTOXICATION, MUST THE COURT SUA SPONTE GIVE A SPECIAL INSTRUCTION STATING THAT ONE FORM OF MANSLAUGHTER IS A PREMEDITATED, DELIBERATE AND INTENTIONAL KILLING WHEN THE DEFENDANT HARBORED NO MALICE DUE TO INTOXICATION?

. . . . . . . . . . . . . . . . . . . . . . .

## III.

### WAS IT ERROR TO ADMIT DEFENDANT'S BANK RECORDS INTO EVIDENCE BECAUSE THE PEOPLE FAILED TO SERVE HER WITH A COPY OF THE SUBPOENA PURSUANT TO GOVERNMENT CODE SECTION 7476?

Chapter 20 of the Government Code regulates government access to financial records. "The purpose of this chapter is to clarify and protect the confidential relationship between financial institutions and their customers and to balance a citizen's right of privacy with the governmental interest in obtaining information for specific purposes and by specified procedures as set forth in this chapter." (Gov. Code, § 7461, subd. (c).)

This chapter sets forth several ways in which records can be obtained from financial institutions by governmental authorities. They are: (1) the customer may authorize disclosure (Gov. Code, § 7473), (2) the government can obtain a search warrant (Gov. Code, § 7475), (3) the records can be obtained by an administrative subpoena or summons (Gov. Code, § 7474), and (4) the records can be obtained by a judicial subpoena (Gov. Code, § 7476).

In September of 1985, the First Interstate Bank in Modesto received a subpoena duces tecum for records relating to accounts in the name of Sarah and/or defendant. On September 20, 1985, the bank attempted to notify defendant of the subpoena by sending a letter to her sister, Mrs. Fisher. The bank had Mrs. Fisher's address because she had previously been to the bank with a letter from defendant requesting that the bank close her checking and savings account and her safety deposit box.

The Wells Fargo Bank in Modesto was served with a subpoena on Septemer 25, 1985, for records pertaining to the Rainbow Cleaning Service business account of Sarah and defendant. The bank was unable to contact defendant.

---

*See footnote, *ante,* at page 841.

On September 29, 1985, defendant's sister gave defendant a copy of the letter which she had received from First Interstate Bank. The authorities failed to serve a copy of the subpoena on defendant in accordance with Government Code section 7476, subdivision (a)(1). Defendant learned of the subpoena the day before trial and made a motion to quash the subpoena on the day of trial.

Government Code section 7476 provides in pertinent part: "(a) Except as provided in subdivisions (b) and (c), an officer, employee, or agent of a state or local agency or department thereof, may obtain financial records under paragraph (4) of subdivision (a) of Section 7470 pursuant to a judicial subpoena or subpoena duces tecum only if: '(1) The subpoena or subpoena duces tecum is issued and served upon the financial institution and the customer in compliance with Chapter 2 (commencing with Section 1985) of Title 3 of Part 4 of the Code of Civil Procedure and the requirements of paragraph (2) or (3) have been met. In the event actual service on the customer has not been made prior to the time the financial records are required to be produced in response to a subpoena or subpoena duces tecum the court shall, prior to turning over any records to the agency, and upon good cause shown, make a finding that due diligence has been exercised by the agency in its attempt to effect such service; and

"(2) Ten days after service pass without the customer giving notice to the financial institution that the customer has moved to quash the subpoena. If testimony is to be taken, or financial records produced, before a court, the 10-day period provided for in this subdivision may be shortened by the court upon a showing of good cause. The court shall direct that all reasonabie measures be taken to notify the customer within the time so shortened. The motion to quash the subpoena must be made, whenever practicable, in the judicial proceeding pending before the court; or

"(3) A judge or magistrate in a judicial proceeding to which the customer is a party rules that the subpoena should not be quashed. Nothing in this paragraph is intended to preclude appellate remedies which may be available under existing law."

Government Code section 7489 provides: "Evidence obtained in violation of this chapter is inadmissible in any proceeding except a proceeding to enforce the provisions of this article."

The court ruled as follows: "It is difficult to tell under 7476 whether requirements one—okay. Whether requirement number one and two must be met or just whether requirement three has been met. In any event, the Court feels all three requirements have been met. The subpoena duces tecum was served on the bank. The Court feels that in view of the testimony

of the bank officers yesterday, due diligence was exercised by the agency. The Court will accept your motion as being one to quash under Subparagraph (3) of 7476(a) of the Government Code, and finds no reason to quash a subpoena duces tecum. So, accordingly, the Court comes to the conclusion that the bank records have been properly obtained, and assuming a proper foundation is laid, assuming that such are relevant, they would be admissible."

■ Defendant asserts that the court's ruling was erroneous because subdivision (a)(1) of Government Code section 7476 was not complied with since defendant was not served with a copy of the subpoena nor did the prosecutor exercise due diligence in an attempt to effect service. Furthermore, defendant asserts that Proposition 8 (Cal. Const., art. I, § 28, subd. (d)) did not abrogate the remedy provided by Government Code section 7489 because the Right to Financial Privacy Act creates a privilege. Furthermore, defendant asserts that this court should not consider the application of Proposition 8 on appeal because the People did not argue it below. Defendant contends that the court's failure to quash the subpoenas and exclude the bank records constitutes reversible error.

Respondent concedes that the defendant was not personally served with the subpoenas and thus there was a technical violation of Government Code section 7476, subdivision (a)(1). Respondent argues that the service of the subpoena on the customer is required only to ensure notice and give the customer an opportunity to object. Defendant had notice and an opportunity to object and was therefore not prejudiced. Citing *People* v. *Meyer* (1986) 183 Cal.App.3d 1150 [228 Cal.Rptr. 635], respondent further contends that the exclusionary provision of Government Code section 7489 was abrogated by Proposition 8.

Assuming that Government Code section 7476 was not complied with, the applicability of Proposition 8 to Government Code sections 7476 and 7489 resolves the issue.

■ Initially defendant asserts that we should not consider the Proposition 8 argument because it was not asserted below. This court on at least cne previous occasion chose to address this class of issues.

"Although the People, as well as the defense, are generally prohibited from asserting new theories on appeal (see *People* v. *Miller* (1972) 7 Cal.3d 219, 227 . . . ; *Lorenzana* v. *Superior Court* (1973) 9 Cal.3d 626, 640-641 . . . ), we elect to consider the 'Right to Truth-in-Evidence' provision on its merits. The argument is purely one of law and does not turn upon any factual determination below. (See *Hale* v. *Morgan* (1978) 22 Cal.3d 388, 394

. . . ." (*People* v. *Truer* (1985) 168 Cal.App.3d 437, 441 [214 Cal.Rptr. 869].)

This holding seems to be in line with the general rule that: "If the *decision* of the lower court is right, the judgment or order will be affirmed regardless of the correctness of the grounds upon which the court reached its conclusion. Two theories seem to be involved here: *First,* that the appellate court reviews the *action* of the lower court and not the reasons for its action; *second,* that there can be no prejudicial error from erroneous logic or reasoning if the decision itself is correct." (9 Witkin, Cal. Procedure (3d ed. 1985) § 259, p. 266.)

Article I, section 28, subdivision (d), of the California Constitution provides: "Except as provided by statute hereafter enacted by a two-thirds vote of the membership in each house of the Legislature, relevant evidence shall not be excluded in any criminal proceeding, including pretrial and post conviction motions and hearings, or in any trial or hearing of a juvenile for a criminal offense, whether heard in juvenile or adult court. Nothing in this section shall affect any existing statutory rule of evidence relating to privilege or hearsay, or Evidence Code, Sections 352, 782 or 1103. Nothing in this section shall affect any existing statutory or constitutional right of the press."

 This section does not affect existing statutory rules of evidence regarding privilege. (*People* v. *Weaver* (1985) 39 Cal.3d 654, 659 [217 Cal.Rptr. 245, 703 P.2d 1139].) Defendant argues that the Financial Privacy Act creates such an evidentiary privilege.

In *People* v. *Meyer, supra,* 183 Cal.App.3d 1150, the defendant sought to suppress certain bank records because the customer listed on the records was not properly notified. (*Id.* at pp. 1162-1163.) The appellate court found that the records were properly admitted and that Government Code section 7489 was abrogated by Proposition 8. (*Id.* at p. 1163.) The court did not discuss privilege; therefore this case is not pertinent to the question now raised by the defendant.

Statutory privileges were established to encourage unbridled open communications and disclosures. Based upon these considerations, the holder of such a privilege has an absolute right to refuse to disclose privileged information. The relationship between a bank and its customers, although deemed by Government Code section 7461, subdivision (c), to be confidential, is not privileged. Neither the bank nor the customer has an absolute right to prevent disclosure of financial information. Upon a proper showing, the financial institution *must* disclose information. The California right to the Financial Privacy Act establishes a statutory *procedure* for the

disclosure of financial information. It does not create a statutory privilege. (See *People* v. *Hole* (1983) 139 Cal.App.3d 431, 438 [188 Cal.Rptr. 693].) Proposition 8 thus abrogated the exclusion of evidence in criminal proceedings under Government Code section 7489. The evidence is thus inadmissible only if it is prohibited by the United States Constitution. (*People* v. *Neer* (1986) 177 Cal.App.3d 991, 998 [223 Cal.Rptr. 555].)

The federal law was established in *United States* v. *Miller* (1976) 425 U.S. 435 [48 L.Ed.2d 71, 96 S.Ct. 1619]. The United States Supreme Court held that there is no constitutional expectation of privacy interest of a depositor in the bank records of his accounts. Bank records are not confidential. (*Id.* at pp. 441-443 [48 L.Ed.2d at pp. 78-79].)

Pursuant to Proposition 8 the bank records were admissible because they were relevant, they were not the subject of a statutory privilege, and they were admissible under the United States Constitution.

## IV.-V.*

. . . . . . . . . . . . . . . . . . . .

The judgment is affirmed.

Woolpert, Acting P. J., and Stone, J., concurred.

A petition for a rehearing was denied November 16, 1987.

---

*See footnote, *ante,* at page 841.