[Crim. No. 24122. Dec. 31, 1985.]

THE PEOPLE, Plaintiff and Respondent, v.
DAVID RIVERA, Defendant and Appellant.

COUNSEL

Jeffrey J. Gale, under appointment by the Supreme Court, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Robert B. Shaw, Deborah D. Factor and Jesus Rodriguez, Deputy Attorneys General, for Plaintiff and Respondent.

Christopher N. Heard as Amicus Curiae on behalf of Plaintiff and Respondent.

OPINION

KAUS, J.*—Defendant David Rivera appeals after a jury convicted him of murder (Pen. Code, § 187) and burglary (Pen. Code, § 459). We reverse for error in the admission of evidence of a prior charged robbery. (*People* v. *Thompson* (1980) 27 Cal.3d 303, 314 [165 Cal.Rptr. 289, 611 P.2d 883]; *People* v. *Haston* (1968) 69 Cal.2d 233, 246 [70 Cal.Rptr. 419, 444 P.2d 91].)

---

*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairperson of the Judicial Council.

On the night of June 12, 1981, four youths burglarized the Stop-N-Go Market in Rialto, San Bernardino County. Four 6-packs of beer were taken from the all-night convenience store. In the course of the getaway, one of the youths, Roland Paez, stabbed the murder victim, a customer at the market who gave chase and attempted to stop the thieves.

Cresencio Quiroz was one of the two youths who entered the store and took the beer. In a taped confession Quiroz implicated defendant Rivera. Later, in separate trials, Quiroz and Paez were convicted of first degree murder and burglary. David Rodriguez, the alleged driver of the getaway vehicle, pleaded guilty of being an accessory to murder.

Three months after the crime, defendant, then seventeen years old, was arrested at his home. He was advised of his rights under *Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974]. On the way to the police station, defendant asked the arresting officer, Detective Shroads, to contact his father. At the station, after *Miranda* advisements were repeated, defendant denied responsibility for the burglary and killing and refused to take a polygraph test. Soon thereafter, however, he made a taped statement, confessing to the burglary, but insisting that he did not stab the victim. His description of the events surrounding the crimes matched that of the other perpetrators and the witnesses.

After the confession defendant met privately with his father and stepmother. About two hours after the interrogation he was transported to juvenile hall by Officer Joseph Cirilo. Cirilo had been on duty the night of the crime and had arrived at the scene before other officers, but had not seen the getaway car. As he and defendant drove to juvenile hall, Cirilo asked defendant "out of curiosity" which way the perpetrators had fled after the crime. Defendant responded by explaining their route.

Defendant was charged with murder on a felony-murder theory. He moved pretrial to suppress all statements made to the police on grounds there had been no adequate waiver of his *Miranda* rights. Applying the criteria enumerated in *People* v. *Lara* (1967) 67 Cal.2d 365 [62 Cal.Rptr. 586, 432 P.2d 202], the trial court found overwhelming evidence that defendant fully knew and understood the rights that he waived orally and in writing. The court denied the motion to suppress.

At trial, evidence of defendant's confession was introduced and Cirilo described his conversation with defendant. Defendant testified on his own behalf, insisting he had been at a party at his sister's house at the time of the incident. He claimed he knew of the crime because Paez bragged to him about it after the perpetrators returned to the party. He said he lied in his

confession to Shroads because he wanted to "cover" the others and because he did not want to be labelled a "snitch." He stated that when he finally implicated Paez as the actual killer, he did so because he thought he might be able to avoid going to juvenile hall. He denied making any admissions to Officer Cirilo.

Upon conviction, defendant was found unamenable to treatment by the Youth Authority and was sentenced to state prison for a term of 25 years to life on the murder count, with a concurrent sentence on the burglary.

On appeal, defendant challenges the admission of his confession and the statement to Officer Cirilo as violative of his privilege against self-incrimination. He also contends that the confession was involuntary, motivated by promises made by the police. Additionally, defendant assigns error in the admission of a prior offense.

We address first the alleged error in the admission of the prior offense, an armed robbery committed about a year and a half before the instant offenses. Over defendant's objection, evidence of the prior offense was admitted on cross-examination. The prosecution offered the evidence to show identity, knowledge, and common scheme and design. (Evid. Code, § 1101, subd. (b).)[1] The trial court found the past and present crimes to have enough shared characteristics to permit introduction of the evidence to prove identity. We disagree.

In order for evidence of a prior crime to have a tendency to prove the defendant's identity as the perpetrator of the charged offense, the two acts must have enough shared characteristics to raise a strong inference that they were committed by the same person. It is not enough that the two acts contain common marks: "[T]he inference of identity arises when the marks common to the charged and uncharged offenses, considered singly or in combination, *logically operate to set the charged and uncharged offenses apart from other crimes of the same general variety* and, in so doing, tend to suggest that the perpetrator of the uncharged offenses was the perpetrator of the charged offenses." (*People* v. *Haston, supra,* 69 Cal.2d 233, 246, italics added; accord, *People* v. *Thompson, supra,* 27 Cal.3d at p. 316.)

In the present case the prosecution sought to justify the admission of the prior offense on the basis of the following "highly distinctive similarities" between the prior offense and the charged conduct: (1) both crimes

---

[1]Section 1101 provides in pertinent part: "(b) Nothing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident) other than his disposition to commit such acts."

occurred on a Friday night; (2) both occurred at approximately 11:30 p.m.; (3) both involved convenience markets; (4) both markets were in Rialto; (5) both markets were located on street corners; (6) both crimes involved three perpetrators; (7) both involved getaway vehicles; (8) prior to both crimes, two or three people were observed standing outside the store; (9) defendant used an alibi defense in both cases: when accused of the prior offense, he claimed to have been with his brother all night; in the current case he claims he spent the evening with his sister.

Taken alone or together, however, these characteristics are not sufficiently unique or distinctive so as to demonstrate a "signature" or other indication that defendant perpetrated both crimes. Convenience stores are often on street corners and are prime targets for crimes; undoubtedly many of these offenses occur late on Friday evenings and involve a getaway car and more than one perpetrator; finally, alibi is a common defense. Moreover, the dissimilarities between the two crimes are significant: (1) the prior offense was armed robbery, a crime against the person, whereas the charged offense was planned as a burglary, a crime against property; (2) the prior involved the taking of money, while the charged crime involved the taking of beer; (3) the coperpetrators in each case were different. In addition, in an attempt to reduce the prejudicial effect of the evidence, the court excluded any mention that guns were used in the prior offense, which further distinguishes it from the present crime, involving no such firearm. In short, the prior offense was a robbery at gunpoint; the charged crime was a "snatch" burglary plus a stabbing. In these circumstances it was error to allow the prior conviction into evidence.

█ Having found error in the admission of the prior offense, we must assess its prejudicial effect. For the purposes of our analysis, we assume no error in the admission of the confession and other statements made to the police. Nonetheless, it is reasonably probable that absent the admission of the prior robbery a result more favorable to defendant would have been reached. (*People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].) Defendant testified he had lied to Shroads in order to "cover" for the other perpetrators and because he thought his cooperation would spare him from going to juvenile hall. Quiroz implicated defendant in his own confession;[2] but there was also evidence that Quiroz was a member of a rival gang and an enemy of the defendant. Finally, no witnesses were able to identify defendant, and no physical evidence linked him with the crimes. Thus any evidence of defendant's prior criminal behavior could easily have influenced the jury to convict.[3] We therefore reverse the judgment.

---

[2]Evidence of the fact that Quiroz' confession implicated defendant was received without objection.

[3]Further, it is noteworthy that a first trial of defendant ended in a hung jury.

Although we reverse on the above-stated grounds, for the guidance of the trial court in the event of a retrial we address defendant's challenge to the admissibility of the confession and subsequent statements to the police.

In pretrial proceedings and at trial, defendant sought to exclude the confession on grounds his waiver was not knowingly and intelligently made under the dictate of *Miranda* and, further, that the confession was involuntary in the traditional sense, motivated by promises made by the police. Defendant's request that Detective Shroads contact his father, made after arrest during transport to the station, was submitted merely as a factor to be considered in support of the dual challenge to the validity of the confession. The specific objection that the request to contact his father constituted an invocation of the privilege against self-incrimination (*People* v. *Burton* (1971) 6 Cal.3d 375 [99 Cal.Rptr. 1, 491 P.2d 793]) was not made in the trial court, but was raised for the first time on appeal. Perhaps it is for that reason that the record is somewhat equivocal as to the exact nature of the defendant's request.[4] The matter will undoubtedly be reexamined and resolved if the case is retried.

■ A finding that defendant was requesting his father's presence would bring into play our decision in *People* v. *Burton, supra,* 6 Cal.3d 375. We held in *Burton* that "when, as in the instant case, a minor is taken into custody and is subjected to interrogation, without the presence of an attorney, his request to see one of his parents, made at any time prior to or during questioning, *must, in the absence of evidence demanding a contrary conclusion, be construed to indicate that the minor suspect desires to invoke his Fifth Amendment privilege.* The police must cease custodial interrogation immediately upon exercise of the privilege. The police did not so cease in this case, the confession obtained by the subsequent questioning was inadmissible, and therefore, the admission of such confession was prejudicial per se . . . ." (6 Cal.3d at pp. 383-384, italics added.) *Burton* establishes a general or "per se" rule that a juvenile's request to speak to his parent constitutes an invocation of his self-incrimination privilege, and, despite previous waivers, the police must cease questioning.

The reference to "evidence demanding a contrary conclusion" in *Burton* recognized the possibility that in some cases the juvenile's own request

---

[4] The evidence was in conflict as to whether defendant asked that his father be *present* during the interrogation—i.e., that he wanted to "speak" to his father. Shroads testified at trial that defendant wanted his father "present," but it is unclear whether this was defendant's actual request. At the pretrial suppression hearing, Shroads stated that defendant requested only for his father to be "contacted." When asked whether defendant "intimated in any way that he wanted his father present prior to being interrogated," Shroads replied that he did not.

might make it clear that he did not wish to speak to his parents for advice in responding to the police questioning, but rather had some other, unrelated purpose in mind—for example, to ask them to bring his toothbrush to juvenile hall. Absent such unusual facts, both our court and the Courts of Appeal have repeatedly interpreted *Burton* to require the police automatically to cease questioning when a juvenile in custody requests to see his parent. (See, e.g., *In re Michael C.* (1978) 21 Cal.3d 471, 475-476 [146 Cal.Rptr. 358, 579 P.2d 7], revd. on other grounds, *Fare* v. *Michael C.* (1979) 442 U.S. 707 [61 L.Ed.2d 197, 99 S.Ct. 2560]; *People* v. *Soto* (1984) 157 Cal.App.3d 694, 705 [204 Cal.Rptr. 204]; *In re Abdul V.* (1982) 130 Cal.App.3d 847, 862 [182 Cal.Rptr. 146]; *In re Roland K.* (1978) 82 Cal.App.3d 295, 300-301 [147 Cal.Rptr. 96].)

Although *Fare* v. *Michael C., supra,* suggests that the *Burton* rule—equating a juvenile's request to speak to a parent with the invocation of his privilege against self-incrimination—may not be compelled by the *federal* self-incrimination clause, *Burton* has been an established part of California jurisprudence for well over a decade and it is appropriate to recognize its holding as one component of the state constitutional privilege against self-incrimination. (Accord *People* v. *Pettingill* (1978) 21 Cal.3d 231, 246-252 [145 Cal.Rptr. 861, 578 P.2d 108].) And, as we recently explained in *Ramona R.* v. *Superior Court* (1985) 37 Cal.3d 802 [210 Cal.Rptr. 204, 693 P.2d 789], evidence obtained in violation of the state constitutional privilege against self-incrimination is inadmissible under Evidence Code section 940.

We briefly note that defendant also assigns error to the trial court's instruction on aiding and abetting. *People* v. *Beeman* (1984) 35 Cal.3d 547 [199 Cal.Rptr. 60, 674 P.2d 1318] will be dispositive of that issue upon retrial.

The judgment is reversed.

Bird, C. J., Broussard, J., and Reynoso, J., concurred.

**GRODIN, J.**—I concur in that part of the majority opinion which concludes that the admission of prior crimes evidence was prejudicial error. The question of prejudice seems to me a close one, but the People have not argued in their briefs that admission of this evidence was not prejudicial. While defendant's explanation of his confession seems quite flimsy to me, it was apparently sufficient to raise a doubt as to his guilt in the minds of some jurors in the first trial. In these circumstances I cannot say that the error was not prejudicial.

Having reached this conclusion I see no need to consider the admissibility of defendant's confession at all, much less engage in what appears to be

largely a semantic debate over whether *People* v. *Burton* (1971) 6 Cal.3d 375 [99 Cal.Rptr. 1, 491 P.2d 793] establishes a "per se" or "totality of circumstances" test for determining when a minor's request to see a parent, made prior to interrogation, must be deemed an invocation of his Fifth Amendment rights. *Burton* holds that such a request must be accorded that effect "in the absence of evidence demanding a contrary conclusion." (*Id.*, at pp. 383-384.) Both the majority and the dissent appear to agree that this rule would not even come into play if it is found that defendant did no more than ask that his father be "contacted," as distinguished from requesting his presence. (See *ante*, p. 394, fn. 4; *post*, p. 403.) What sort of evidence would overcome the *Burton* presumption in the event of a finding favorable to defendant on this question is not a matter on which I am prepared to speculate.

**MOSK, J.**—I dissent.

There are two issues in this case: whether a juvenile subject to custodial interrogation invokes his privilege against self-incrimination when he purports to request the presence of a parent, and whether evidence of defendant's prior conviction was erroneously admitted.

The facts are generally related in the majority opinion. However, some elaboration will be helpful, and discussion in reverse order to that employed by the majority is more consistent with the contentions of defendant and response of the People.

Defendant, though then 17 years of age, was no novice to arrest and interrogation: this was his eighth arrest. The officer, Detective Shroads, handcuffed him and advised him of his rights under *Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974]. On the way to the police station, defendant claims he asked Shroads to contact his father. There is conflict as to whether defendant asked that his father be *present* during the interrogation. Shroads testified at trial that defendant wanted his father "present," but it is unclear whether this was defendant's actual request. At the pretrial motion to suppress defendant's confession, Shroads stated that defendant requested only for his father to be "contacted." When asked whether defendant "intimated in any way that he wanted his father present prior to being interrogated," Shroads replied that he did not. In any event Shroads telephoned defendant's father, who indicated he would come to the station in 20 to 30 minutes.

Defendant and the officer then entered an interrogation room, where the latter turned on a tape recorder. Defendant was again advised of his rights, and the following exchange took place:

"Q. Do you understand the rights I've just explained to you? A. Yes, sir.

"Q. With these rights in mind, are you willing to talk to me at this time? A. Well, yes, but I don't really understand what's going on.

"Q. Okay, I've already called your father, okay? At your request. Is that right? A. Yes.

"Q. And he said he would be on his way. Would you like to talk to me about this incident? A. Well, whatever we're sitting here talking about."

Defendant then claimed to have been at a party at his sister's home on the night of the crime. Shroads proceeded to question him about his sister and her party. Defendant insisted he did not kill anyone. Shroads then proposed a polygraph test.

"Q. You wanna take a lie detector test, David? A. For what? To say if I killed somebody or not?

"Q. Yeah. A. Well, I'd have to talk to my dad before . . . .

"Q. You're supposed to be a man now. You're talking to God and saying you're doing right, and you're telling me that you never did nothing like that. Why do you have to talk to your dad? A. I don't know.

"Q. Your dad ain't gonna help you. A. I know, but a lie detector test.

"Q. Hey brother, you're telling me that you didn't do anything. You didn't have anything to do with killing this old man, right? A. What're you going to do? Put that on there and ask me if I killed him?

"Q. All it is is a little thing that takes your blood pressure, and you sit there, and they ask you some questions. That's it. Period. There ain't no needles. There ain't no clubs. There ain't no somebody standing there with a gun. There's just you and a man that runs a polygraph machine. A. When would I take that?

"Q. As soon as I could get it scheduled for you. Yes or no? A. Well, I'd have to think about it, though.

"Q. No thinking about it, buddy. There ain't no time to think about it. That old man that's laying in the grave right now ain't got nothing to think about."

Defendant continued to deny any responsibility for the burglary and killing, and to refuse to take the polygraph test. He expressed a great deal of concern about going to juvenile hall, and finally voluntarily offered that he knew about the crime through the perpetrators' bragging. In an attempt to make a deal, defendant said he would testify against the perpetrators, but would not take a polygraph test. Shroads insisted no promises about juvenile hall could be made, and defendant would have to spend at least the night there. The officer then announced the interview was over, and turned off the tape machine.

Four minutes later, he started the tape again, and defendant once more waived his rights. The taped confession of Quiroz was played. Before defendant was mentioned on the tape, he confessed to the burglary, but insisted he did not stab Lockridge. His description of the events surrounding the crimes matched those of the other perpetrators and the witnesses. After this confession defendant met privately with his father and stepmother.

Approximately two hours after his interrogation, defendant was transported to juvenile hall by Joseph Cirilo, another police officer. Cirilo had been on duty the night of the crime, had arrived at the scene before any other officers, but had not observed the getaway car. As he and defendant drove to juvenile hall, Cirilo asked defendant out of curiosity which way the perpetrators had fled after the crime. Defendant responded by explaining their route.

At trial, evidence of defendant's confession was introduced and Cirilo described his conversation with defendant. Defendant testified on his own behalf, insisting he had been at a party at his sister's house at the time of the incident. He claimed he knew of the crime because Paez bragged to him about it after the perpetrators returned to the party. He said he lied in his confession to Shroads because he wanted to "cover" the others and because he did not want to be labelled a "snitch." He stated that when he finally implicated Paez as the actual killer, he did so because he thought he might be able to avoid going to juvenile hall. He denied making any admissions to Officer Cirilo.

Defendant contends his confession was unconstitutionally obtained because Detective Shroads did not cease questioning him when he asked for his father. He relies on *People* v. *Burton* (1971) 6 Cal.3d 375 [99 Cal.Rptr. 1, 491 P.2d 793], for the proposition that a minor who is subjected to custodial interrogation per se invokes his privilege against self-incrimination if he requests to speak to his parent.

Some courts—and, indeed, the majority herein—appear confused regarding whether *Burton* prescribed a per se rule, or whether it held the minor's

request to see his parent to be but one factor—albeit an important one—in evaluating whether the minor's waiver of his rights was voluntary.[1] An examination of *Burton* and its predecessors reveals that it did not create a per se rule.[2]

In *Miranda* v. *Arizona, supra,* 384 U.S. 436, the United States Supreme Court set forth the advice to be given a suspect and the guidelines by which every custodial interrogation must be conducted. "Once warnings have been given, the subsequent procedure is clear. If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. At this point he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise." (*Id.* at pp. 473-474 [16 L.Ed.2d at p. 723].)

In *People* v. *Fioritto* (1968) 68 Cal.2d 714 [68 Cal.Rptr. 817, 441 P.2d 625], we emphasized that questioning must cease once a defendant has invoked his rights. In that case the defendant refused to sign a waiver of his rights, but the police proceeded to confront him with his accomplices, who had implicated him in their confessions. We held his subsequent confession inadmissible. Even though the accomplices' statements brought a new factor into the situation, the defendant had once invoked his rights. This invocation meant that the police could not permissibly continue to question him. (*Id.* at p. 719.) Further, if a confession obtained in violation of the defendant's constitutional rights is admitted at trial, the error is prejudicial per se and the conviction must be reversed. (*Id.* at p. 720.)

In a series of cases since *Fioritto* this court has reviewed various fact situations claimed to constitute a waiver of the defendant's privilege. In *People* v. *Ireland* (1969) 70 Cal.2d 522 [75 Cal.Rptr. 188, 450 P.2d 580, 40 A.L.R.3d 1323], the defendant requested that the police call his parents to find his attorney. Nevertheless, the police continued to question him and he confessed. We held his confession involuntary: "One of the primary

---

[1]In a letter to this court, defendant maintains he never argued that *Burton* created a per se rule. There is, however, no other way to read his briefs.

[2]The Courts of Appeal are in conflict as to whether *Burton* creates a per se rule. (See *In re Jessie L.* (1982) 131 Cal.App.3d 202, 215 [182 Cal.Rptr. 396] [no requirement that minor be advised of and waive the opportunity to speak to a parent]; *In re Anthony J.* (1980) 107 Cal.App.3d 962, 971 [166 Cal.Rptr. 238] [even when a juvenile is involved, the totality-of-the-circumstances approach affords adequate protection]; *In re Roland K.* (1978) 82 Cal.App.3d 295, 300-301 [147 Cal.Rptr. 96] [People must demonstrate that minor's request to call his parents was not an indication of his unwillingness to speak to the police]; but see *People* v. *Soto* (1984) 157 Cal.App.3d 694, 705 [204 Cal.Rptr. 204]; *In re Abdul Y.* (1982) 130 Cal.App.3d 847, 862 [182 Cal.Rptr. 146]; *In re Gregory S.* (1980) 112 Cal.App.3d 764, 773 [169 Cal.Rptr. 540]; *In re Patrick W.* (1980) 104 Cal.App.3d 615, 618-619 [163 Cal.Rptr. 848].)

'protective devices' envisioned by *Miranda* is that . . . custodial interrogation wholly cease when the suspect indicates in any manner that he wishes to exercise his Fifth Amendment privilege. . . . Clearly defendant's request manifests a desire to have the assistance of his attorney at the earliest possible moment. This, under *Miranda,* is an assertion of the Fifth Amendment privilege—and therefore 'the interrogation must cease until an attorney is present.' [Citation.]" (*Id.* at pp. 535-536.)

In *People* v. *Randall* (1970) 1 Cal.3d 948, 958 [83 Cal.Rptr. 658, 464 P.2d 114], we emphasized that the People have the burden of demonstrating a confession is voluntary, and must affirmatively prove that the actions of the defendant did not manifest a desire to invoke his rights. The defendant in *Randall* had telephoned his attorney; we held this act strongly demonstrated the defendant's reluctance to waive his rights. Moreover, we held there can be no clearcut manner in which a defendant must invoke his rights: "To strictly limit the manner in which a suspect may assert the privilege, or to demand that it be invoked with unmistakable clarity (resolving any ambiguity against the defendant) would subvert *Miranda*'s prophylactic intent." (*Id.* at p. 955.) Any conduct that "reasonably appears inconsistent with a present willingness on the part of the suspect to discuss his case freely and completely with the police *at that time*" (*id.* at p. 956, italics in original) is sufficient to invoke the privilege.

We applied this "reasonably inconsistent" test to the context of a minor who requested the presence of his parents in *People* v. *Burton, supra,* 6 Cal.3d 375. There the 16-year-old defendant's request to see his parents was denied. He was then advised of his rights, and waived them; during the subsequent interrogation he made a full confession. We noted this was a case in which the defendant did not expressly invoke his rights, and thus the circumstances would have to be examined to determine whether his conduct was reasonably inconsistent with a present willingness to submit to police questioning. (*Id.* at pp. 381-382.) We held that a request by a minor to see his parents was a strong indication that the minor did not desire to be interrogated: "It appears to us most likely and most normal that a minor who wants help on how to conduct himself with the police and wishes to indicate that he does not want to proceed without such help would express such desire by requesting to see his parents." (*Id.* at p. 382.) When a minor asks to see his parent, the People have the burden of demonstrating that the request was not an invocation of the defendant's privilege. (*Id.* at p. 383.)

In *Fare* v. *Michael C.* (1979) 442 U.S. 707 [61 L.Ed.2d 197, 99 S.Ct. 2560], the United States Supreme Court reversed our decision, rendered by a divided court, in *In re Michael C.* (1978) 21 Cal.3d 471, 477 [146 Cal.Rptr. 358, 579 P.2d 7], that a juvenile who requested to see his pro-

bation officer prior to being interrogated invoked his privilege against self-incrimination no less than "if he asked for the presence of an attorney." The Supreme Court began its decision by insisting that *Michael C.,* which relied heavily on *Burton,* created a per se rule of invocation. It reasoned this to be so because our opinion had relied on *People* v. *Randall, supra,* 1 Cal.3d 948. In *Randall* we held that a confession would be admissible even if obtained after the defendant's privilege had been invoked if the People could prove the defendant initiated new contact with the police. (*Id.* at p. 956.) Thus the Supreme Court opined that *Randall*'s discussion of the People's burden of proof went to the issue whether the defendant waived the rights he had previously asserted. (442 U.S. 707, 716, fn. 3 [61 L.Ed.2d 197, 207].) The court went on to hold that the per se aspect of *Miranda* is limited to the request for an *attorney,* based on the "unique role the lawyer plays in the adversary system of criminal justice in this country." (*Id.* at p. 719 [61 L.Ed.2d at p. 209].)

Presumptuous though I may be, it appears that the Supreme Court has not properly interpreted *Randall, Michael C.,* and by implication, *Burton, Ireland,* and *Fioritto.* It is true that in *Burton* and *Michael C.* we analogized the minor's request to speak to a parent or a probation officer to an adult's request to speak to an attorney. (6 Cal.3d at p. 382; 21 Cal.3d at p. 477.) But we did not equate these requests. Rather we held that the requests in each case manifested the defendant's present unwillingness to speak to the police. The prosecution in each case then failed to meet its burden of proving the defendant's request was not an invocation of his rights.

In *Fare,* the Supreme Court held that to ascertain whether the confession is voluntary, the trial court must make an inquiry into the "totality of the circumstances" surrounding the interrogation. (442 U.S. at pp. 724-725 [61 L.Ed.2d at pp. 212-213].) A minor defendant's request to speak to his probation officer is one of those circumstances, and should be taken into consideration in evaluating voluntariness. (*Id.* at p. 724 [61 L.Ed.2d at p. 211].) Thus the court incorporated the question whether the defendant invoked his rights into the ultimate issue of whether he voluntarily waived his rights. As we observed in *People* v. *Robertson* (1982) 33 Cal.3d 21, 40 [188 Cal.Rptr. 77, 655 P.2d 279], "the *Fare* court concluded that the determination of whether a defendant's request to speak to someone other than an attorney represents an invocation of his right to remain silent must 'be made upon an inquiry into the totality of the circumstances surrounding the interrogation . . . .'"

We have long held that the voluntary nature of a minor's confession must be judged by the totality-of-the-circumstances test. In *People* v. *Lara* (1967) 67 Cal.2d 365 [62 Cal.Rptr. 586, 432 P.2d 202], 2 defendants, one 17

years old, the other 18 years old, confessed to murder. Although both were fully advised of their rights, they maintained their waivers were not knowing and intelligent. In rejecting their claims, we held that "the issue [of whether a minor's waiver is knowing and intelligent] is one of fact, to be decided on the 'totality of the circumstances' of each case." (*Id.* at p. 389.) "Among the circumstances emphasized by the courts as tending to show that the minor possessed the capacity required to make a voluntary confession are his prior experience with the police and courts [citations] and the fact that advice as to his legal rights was given to him before he confessed [citations] . . . ." (*Id.* at p. 385.) Also to be considered are factors such as the minor's age, "intelligence, education, experience, and ability to comprehend the meaning and effect of his statement." (*Id.* at p. 383.)

The rule that evolves from the cases is this: to determine the validity—and hence the admissibility—of a minor's confession, the court must make a two-step inquiry. First, the court must evaluate the minor's capacity to make a valid waiver. This inquiry focuses on the *characteristics* of the individual defendant and employs the factors set forth in *Lara.* Next, the court must determine whether the minor actually did waive his rights in a knowing, intelligent and voluntary manner. This inquiry examines the *behavior* of the minor and the police and the events surrounding the waiver. Included in this inquiry must be a determination that the minor did not invoke his right to silence in any way: any "conduct [that] reasonably appears inconsistent with a present willingness on the part of the suspect to discuss his case freely and completely with the police *at that time*" (*People* v. *Randall, supra,* 1 Cal.3d 948, 956, italics in original) must put an end to further police questioning. As with adult defendants, a "heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel." (*Miranda* v. *Arizona, supra,* 384 U.S. at p. 475 [16 L.Ed.2d at p. 724].) The determination is primarily one for the trial court (*People* v. *McFarland* (1971) 17 Cal.App.3d 807, 816 [95 Cal.Rptr. 369]), but the reviewing court must independently examine the entire record to insure that the judge did not abuse his discretion (*People* v. *Davis* (1981) 29 Cal.3d 814, 824 [176 Cal.Rptr. 521, 633 P.2d 186]). If there is conflicting testimony, the court must interpret it in the light most favorable to the prosecution, if the evidence supports that version. (*People* v. *Jackson* (1980) 28 Cal.3d 264, 300 [168 Cal.Rptr. 603, 618 P.2d 149].)

I would adapt the *Lara-Randall* tests to the facts at hand. First, defendant's personal characteristics reveal he had substantial capacity to make a valid waiver. He was 17 years old at the time of the arrest and interrogation. There was no evidence that he was of low intelligence, or had less than normal education and worldly experience. Although he may not have been

aware that under the law his confession to the burglary would render him legally liable for murder, there is nothing in the record to suggest he did not understand the meaning of his confession or the fact that it would expose him to criminal liability; indeed, he was aware that he was charged with murder.

Moreover, the record discloses seven prior arrests of the defendant; advised of his rights, he invoked them in some of these instances and waived them in others. Thus he has had significant prior contact with the police and the courts. The prior arrests, advisements, waivers and invocations all indicate that defendant was well aware of the procedures of police stations and courts, and knew how to invoke his rights if he so desired. Finally, in the present case he was fully advised of his legal rights twice between his arrest and his confession.

Turning to the second step of the inquiry, I consider defendant's claim that the circumstances surrounding the interrogation demonstrate his confession was involuntary. First, he maintains that his request for his father, if not a per se invocation of his rights, at least amounted to a manifestation of unwillingness to talk to the police. Defendant's first mention of his father came during the ride to the station. When the evidence is viewed in the light most favorable to the People, defendant must be found to have asked Shroads simply to contact his father, not to have demanded his presence at the interrogation. This request is not necessarily inconsistent with a desire to talk to the police. (*Fare* v. *Michael C., supra,* 442 U.S. 707, 724 [61 L.Ed.2d 197, 211].) Here Shroads informed defendant he had telephoned the father, who said he would be on his way to the station. Defendant then indicated he was willing to discuss the incident. Thus it does not appear that by asking for his father he intended to stop the questioning.

Defendant's second mention of his father occurred when he was asked to take a polygraph test. He said he would have to ask his father. The officer then exhorted him to "be a man" and "stand on his own two feet." Defendant contends this request for his father was an invocation of his rights, and that he was bullied into confessing. However, the crucial factor is that defendant never did take a polygraph test, and continued to refuse to do so even after agreeing to testify against his coperpetrators. He was thus able to separate submitting to a machine—the polygraph test—from being interrogated, agreeing to the latter while refusing the former. Even if his request for his father's advice could be deemed an unwillingness to take the polygraph test, such reticence does not establish that the defendant was also reluctant to talk to the police. (*People* v. *Davis, supra,* 29 Cal.3d 814, 825.)

Defendant claims his words of waiver demonstrated that his confession was involuntary. He emphasizes that when asked whether he was willing to

talk to Shroads despite his right not to do so, he responded, "Well, yes, but I don't really understand what's going on." When Shroads asked if he wanted to discuss the "incident," he replied, "Well, whatever we're sitting here talking about." Although these words could suggest that a novice might have been confused and did not understand the nature and seriousness of the interrogation, I view them in relation to this defendant's extensive experience with the police and courts, and his numerous prior invocations and waivers of his rights. As the trial judge noted, in the context of defendant's prior experience, his statements appear to be a denial or an exculpatory statement rather than "real confusion."

Defendant maintains his motivation for confessing was his belief that by talking he could avoid going to juvenile hall. The record shows, however, that Shroads was scrupulously careful not to promise defendant anything he could not deliver. He repeatedly informed defendant that he would have to spend at least the night in confinement. When defendant asked if he would get out if he supplied information, Shroads answered, "I can't guarantee you anything, young man. You know something? The court is the only people that can guarantee you anything. If you wanna tell me, all I can do is tell the judge that this man did me a favor and I'll do that. But that's the only thing that I'll do for you." It is apparent that if in fact defendant confessed to avoid juvenile hall, it was not because the officer misled him.

Defendant next asserts that if a minor's parents are actively seeking to speak to the minor, the police have an absolute duty to tell him that he has a right to see them. He relies on *In re Gregory S.* (1980) 112 Cal.App.3d 764, 773 [169 Cal.Rptr. 540], which held that "even absent a [minor's] request [to see his parents], if parents are available and wish to speak to a minor in *custody,* police are under a duty to advise the minor of his right to see them before interrogation can take place." (Italics in original; see also *In re Patrick W.* (1980) 104 Cal.App.3d 615, 617 [163 Cal.Rptr. 848], cert. den. (1981) 449 U.S. 1096 [66 L.Ed.2d 824, 101 S.Ct. 893].) However, we have never indicated that such an extension of *Miranda* is controlling. The rule regarding parental advisement was set forth in *People* v. *Lara, supra,* 67 Cal.2d 365, 378-379: "We cannot accept the suggestion of certain commentators (see 7 Santa Clara Lawyer 114, 127 (1966); 40 Wash.L.Rev. 189, 200-201 (1965)) that every minor is incompetent as a matter of law to waive his constitutional rights to remain silent and to an attorney unless the waiver is consented to by an attorney or by a parent or guardian who has himself been advised of the minor's rights. Such adult consent is of course to be desired, and should be obtained whenever feasible. But . . . whether a minor knowingly and intelligently waived these rights is a question of fact; and a mere failure of the authorities to seek the additional consent of an adult cannot be held to outweigh, in any given

instance, an evidentially supported finding that such a waiver was actually made." (See also *People* v. *Davis, supra,* 29 Cal.3d 814, 826; *In re Charles P.* (1982) 134 Cal.App.3d 768, 772 [184 Cal.Rptr. 707]; *In re Jessie L.* (1982) 131 Cal.App.3d 202, 215 [182 Cal.Rptr. 396]; *In re Abdul Y., supra,* 130 Cal.App.3d 847, 866; *In re Anthony J.* (1980) 107 Cal.App.3d 962, 974 [166 Cal.Rptr. 238].)

A knowledgeable minor—and particularly a minor with vast experience with the police—is capable of giving a valid confession without his parents' consent or advice. Nor is there a requirement that the police inform a minor that he has a right to see his parents before being interrogated. Of course, if the police have purposely kept from a minor the fact that his parent is actively seeking to speak with him, such abusive tactics should feature prominently in any evaluation of whether the minor's confession was indeed voluntary.

In the case at bar, Detective Shroads did not act in a devious manner. He telephoned defendant's father shortly after arriving at the station. He informed defendant that his father had been contacted and would come to the station soon thereafter. Under these circumstances, Shroads' failure to inform defendant that he could await his father's arrival before the questioning began did not render the confession involuntary.

Under the totality of circumstances I would hold that defendant's confession was voluntary, following a knowing and intelligent waiver. It was thus properly admitted into evidence. Moreover, defendant's admission to Officer Cirilo, made approximately four hours after his waiver, and after he had met privately with his father and stepmother, was also admissible. Defendant's only contention with regard to that damaging admission was that it was tainted by his assertedly improper confession. Since his confession was constitutionally obtained, I reject this challenge as well.

Finally, I reach the issue—not even raised in the original petition for hearing—of the admission of defendant's prior conviction. Over objection, evidence of his prior conviction for armed robbery was admitted on cross-examination. The court found the past and present crimes to have enough shared characteristics to permit introduction of this evidence to prove identity.

We have held that "The admission of any evidence that involves crimes other than those for which a defendant is being tried has a 'highly inflammatory and prejudicial effect' on the trier of fact," and thus must be "'scrutinized with great care.'" (*People* v. *Thompson* (1980) 27 Cal.3d 303, 314 [165 Cal.Rptr. 289, 611 P.2d 883].) Three factors govern the admissibility

of such evidence: (1) it must be material to a disputed fact; (2) it must tend to prove or disprove that fact; and (3) there must be no policy otherwise requiring exclusion. (*Id.* at p. 315.) The prior conviction herein was introduced to prove defendant's identity as one of the perpetrators, a material fact placed squarely in dispute by defendant's testimony. Thus the first requirement for admissibility is satisfied. (*Id.* at p. 315 and fn. 13.)

The second prong of the admissibility test, though debatable, also appears to be met. In order for evidence of a prior crime to have a tendency to prove the defendant's identity as the perpetrator of the charged offense, the two acts must have enough shared characteristics to raise a strong inference that they were committed by the same person. But it is not enough that the two acts share certain common marks: "[T]he inference of identity arises when the marks common to the charged and uncharged offenses, considered singly or in combination, logically operate to set the charged and uncharged offenses apart from other crimes of the same general variety and, in so doing, tend to suggest that the perpetrator of the uncharged offenses was the perpetrator of the charged offenses." (*People* v. *Haston* (1968) 69 Cal.2d 233, 246 [70 Cal.Rptr. 419, 444 P.2d 91]; accord, *People* v. *Thompson, supra,* 27 Cal.3d at p. 316.)

In the case at bar, the People point to the following shared characteristics of the prior conviction and the charged conduct: (1) both crimes occurred on a Friday night; (2) both occurred at approximately 11:30 p.m.; (3) both involved convenience markets; (4) both markets were in Rialto, California; (5) both markets were located on street corners; (6) both crimes involved three perpetrators; (7) both involved getaway vehicles; (8) prior to both crimes, two or three people were observed standing outside the store; (9) defendant used an alibi defense in both cases: when accused of the prior offense, he claimed to have been with his brother all night, and in the current case he claims he spent the evening with his sister.

Taken alone or together, it is a question of fact whether these characteristics are sufficiently unique to demonstrate a "signature" or other indication that defendant perpetrated both crimes. Although other offenses by other persons arguably could have been committed in the same pattern, the combination of nine circumstances could properly be considered by the jury in determination of identity.

Finally, defendant contends the court committed error under *People* v. *Beeman* (1984) 35 Cal.3d 547 [199 Cal.Rptr. 60, 674 P.2d 1318], because the jury was not instructed that in order to convict it must find that he acted with knowledge of the criminal purpose of the burglary's perpetrator and with intent to commit burglary. However, the jury was instructed that in

order to find defendant guilty of felony murder based on the burglary, it had to find that defendant had the specific intent to commit a burglary. Accordingly, no *Beeman* error appears.

I would affirm the judgment.

Lucas, J., concurred.