[EDITORS' NOTE: THIS OPINION IS DEPUBLISHED UPON GRANTING OF PETITION FOR REVIEW. THE OPINION APPEARS BELOW WITH A GRAY BACKGROUND.]
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 1087 
OPINION
A jury convicted Tony Lessie of second degree murder (Pen. Code, [1]
§ 187, subd. (a)) and found true allegations that during its commission Lessie had intentionally and personally used and discharged a firearm, proximately causing great bodily injury and death to a person (§§ 12022.5, subd. (a), 12022.53, subd. (d)).[2] The trial court sentenced Lessie to prison for a total term of 40 years to life.
 Lessie's sole contention on appeal is that the trial court erred in denying his motion to suppress his pretrial admissions made during two interviews on *Page 1088 
September 20 and 21, 2005, which were allegedly obtained in violation of his rights under Miranda v. Arizona (1966) 384 U.S. 436 [16 L.Ed.2d 694,86 S.Ct. 1602] (Miranda). Lessie, who was 16 years old at the time of those interviews, essentially asserts that because People v. Burton
(1971) 6 Cal.3d 375, 383-384 [99 Cal.Rptr. 1, 491 P.2d 793] (Burton), which specifically holds that a minor's request to consult with a parent "made at any time prior to or during questioning, must in the absence of evidence demanding a contrary conclusion, be construed to indicate that the minor suspect desires to invoke his Fifth Amendment privilege," is still binding authority in California, the trial court's failure to follow this per se rule of Burton, instead of determining under the "totality of the circumstances" test of Fare v. Michael C. (1979)442 U.S. 707, 728 [61 L.Ed.2d 197, 99 S.Ct. 2560] (Fare) and People v.Hector (2000) 83 Cal.App.4th 228 [99 Cal.Rptr.2d 469] (Hector) that he did not invoke his Miranda rights to remain silent or ask for an attorney by requesting to speak to his father before he was read those rights during questioning at the first police station interview, constitutes reversible error. Alternatively, Lessie contends that even under the totality of the circumstances standard of Fare and Hector there was insufficient evidence to support the court's determination that his request to call his father was merely to notify him of his arrest. Lessie further asserts that because his request to talk to his father at the first interview invoked his right to counsel, his admissions at the second interview the next day at juvenile hall were required to be suppressed under Edwards v. Arizona (1981) 451 U.S. 477 [68 L.Ed.2d 378,101 S.Ct. 1880] (Edwards).
 We agree with the reasoning and conclusion in Hector that the holdings of Burton, supra, 6 Cal.3d 375 and Fare, supra, 442 U.S. 707 are reconcilable and both "demand consideration of the circumstances surrounding a minor's request to speak to a parent to determine whether that request constitutes an invocation of the right to remain silent or a request for an attorney." (Hector, supra, 83 Cal.App.4th at p. 230.) Accordingly, we determine that under the "totality of the circumstances" test of those cases Lessie knowingly and voluntarily waived his Miranda
rights and did not invoke them by requesting to speak to his father during the first police interview on September 20, 2005. Consequently, because Lessie did not invoke his right to counsel at that time, the second interview the next day did not violate the Edwards rule. We therefore conclude that the trial court properly denied Lessie's suppression motion and affirm the judgment.
 BACKGROUND Lessie does not challenge the sufficiency of the evidence to support the jury's verdict and findings he fired the gun that killed Rusty Seau on June 9, 2005, in Oceanside, California. Rather, the facts pertinent to our discussion of *Page 1089 
his appellate issues come from the suppression motion documents, the transcripts of the custodial interviews on September 20 and 21, 2005, [3] and the record of the hearing on the matter.
 In limine, Lessie filed a motion to exclude his pretrial statements made during interviews that took place on September 20, 21, and December 27, 2005, on grounds the arresting detectives willfully deprived him of his statutory right under Welfare and Institutions Code section 627, subdivision (b)[4] to make telephone calls to his father and attorney within one hour of being taken into custody and continued to question him after he invoked his right to remain silent by asking to call his father. The People filed opposition and a countermotion to admit Lessie's post-Miranda statements, asserting Lessie had knowingly, intelligently and voluntarily waived his Miranda rights at both his first and second interviews, and claiming there was no statutory violation of the notice requirements of Welfare and Institutions Code section 627 because Lessie had been arrested at a family member's home and his indication he wanted to call his father was not an invocation of his Miranda rights based on the totality of the circumstances test set out in Fare, supra,442 U.S. 707 and Hector, supra, 83 Cal.App.4th 228.
 At the hearing on the matter, the parties clarified that the motion would only pertain to the statements from the September 20 and 21, 2005 interviews, and the prosecutor called the detective who had arrested Lessie to testify about the timing of various admonishments and Lessie's requests to talk to his father.
 Oceanside Police Detective Kelly Deveney testified that Lessie was arrested on September 20, 2005, around 6:40 a.m., at the home of his aunt and uncle in Hemet, California. Deveney first talked with Lessie about 40 minutes after his arrest as he sat in the back of the police car. At that time, she identified herself and told him he was "under arrest for J.D.O. from his probation officer," i.e., a warrant issued by probation, and that he was being *Page 1090 
transported back to Oceanside. She also told him that once they got to Oceanside "he could make as many phone calls as he wanted to whomever he wanted. And then I told him I understand your aunt and uncle know that you're in custody; is there anyone else we need to notify and he said yes, his father." Lessie did not have his father's telephone number with him.
 After an approximate hour and a half transport from Hemet to the Oceanside Police Department, Lessie was placed in an interview room that was being recorded "digitally . . . and via VHS tape." Deveney had viewed the tape and explained it showed Lessie sat there for the first 10 to 15 minutes with his hands underneath his shirt before Oceanside Police Detective Gordon Govier arrived with breakfast for him. Deveney estimated another 10 or 15 minutes passed before she and Govier arrived in the room to begin the first interview, which was later transcribed. Deveney recalled that at that time she told Lessie a phone number for his father had been located and asked him if he wanted her "to make the call to his father advising that [Lessie] was in custody, or if he wanted to make that call himself." Lessie told her "he wanted to make the call." Deveney then continued with the "process."
 On cross-examination, Deveney said that Lessie had been given a telephone to call his father before the interview ended when he actually asked to talk to his father for a minute and the officers took a break and "gave him a Nextel[, a cellular phone]." Upon looking at the transcript of the interview, Deveney clarified that the request to talk to his father came at page 41 of the 50-page transcript, and that Lessie had continued talking up to that point in time. The videotape showed Lessie then making several telephone calls, not just one to his father.
 The parties then submitted the matter on the transcript of that interview, [5] which showed that after some initial "small talk" and Deveney's query as to whether Lessie wanted the detectives to make the call to notify his father, Deveney again asked Lessie whether he wanted to call his father himself in response to Lessie's reply that he would like to be the one to call his father. When Lessie responded, "M-hm," Deveney said, "Okay. So in the meantime, we've just got to fill out these papers. You go by Tony Lessie, right?" After Deveney asked more general questions concerning Lessie's age, height, weight, birth place, school, work and father's name and address, the following exchange took place. *Page 1091 
 "DEVENEY: Okay. [Lessie] because you're under age, you're only sixteen, and because you're in our facility, I have to read you your rights. Alright. So, it's no big deal but I have to by law. You have the right to remain silent. Do you understand that? Can you say yes?
 "LESSIE: Yeah.
 "DEVENEY: Any statements you make may be used as evidence against you. Do you understand that?
 "LESSIE: Yeah.
 "DEVENEY: Okay. You have the right to the presence of an attorney, either retained or appointed free of charge, before and during questioning. Do you understand that?
 "LESSIE: Yeah.
 "DEVENEY: So you understand those rights?
 "LESSIE: Yeah."
 Deveney then asked several more general questions regarding Lessie's appearance and clothing before asking him if his father worked or whether she would be able to reach him at home. Lessie explained that the detective had the cell phone number for his father. Deveney proceeded to then question Lessie about knowing a man named "Black Jack," at whose house the detectives had found two birth certificates in Lessie's name. After admitting that both certificates were his, Lessie proceeded to give his family background, explaining that his name had been changed after his birth when his grandparents adopted him; that he originally grew up in Oceanside before moving to Perris, California, and then came back to Oceanside to live with his father after he got in trouble in school there; and that he left his father's house after fighting with his sister and went to stay with James Turner (Black Jack), whom he knew through a friend. Lessie knew that Turner was involved in some fraudulent dealings like identity theft, but denied that he was also involved in them. He claimed he left Turner's home because of the identity scams and went up to Hemet to live with his relatives.
 Lessie also told Deveney that he had violated his probation when he got into the fight with his sister, that his probation officer was "evil," and that the *Page 1092 
last time he had violated probation, he had been locked up, having "to do four months out of six." After talking some more about the fraud schemes and whether Turner's cousins had also been involved in them, Deveney then questioned Lessie about his awareness of gangs in Oceanside and whether he knew that Turner was involved in a gang. When Lessie explained that that was one reason he was done with Turner and his whole crowd, Deveney told him that that was good because there were rumors Turner and his cousin were around "when that other shooting happened in June. A kid over by the back gate got killed."
 When Lessie immediately asked, "You're talking about Rusty?," the interchange between Deveney and Lessie turned to whether Lessie was with Turner that day when a crowd of youths, many gang members, was on the street fighting before Rusty was shot. After Lessie claimed he had nothing to do with the fight or shooting, Deveney asked him whether he would be surprised to know that "some people in your family have said that you told them [about your involvement in the incident]."
 When Deveney then asked whether there was a good reason Lessie had become involved in the incident, Lessie stated, "[w]ell to just scratch everything, to just come clean with it: I was there, I was, I was there and I was the shooter. But the thing that happened was that if I didn't shoot, I was going to, you know what I'm saying, get hurt by the other people." Lessie explained that "it was like an initiation thing. So like if I didn't do this, they were going to get me." He further explained that the incident stemmed from an earlier incident that day when he and Turner and some people got into a disagreement about Turner's girlfriend at a Vons store. They were to meet the other people on the block where the shooting occurred. After picking up some other people, Lessie was given a gun in the car, taught how to shoot it and told he would be the one to use it. When they arrived at the block and found that the other people did not want to fight, Turner saw Seau walking down the street, started jumping him, and when he ran, ordered Lessie to shoot him. Lessie shot twice at Seau when Turner walked toward him after again ordering him to shoot. When Lessie claimed that Turner then shot the gun at least two more times, Deveney told him that witnesses saw only one person shooting who afterwards ran back to the car with the gun still in his hand. Lessie conceded, "[y]eah, I shot," and nodded that he was the only shooter.
 When Deveney then asked whether Lessie was alright or needed a break, Lessie said, "I would like to talk to my dad." Before Deveney left the room *Page 1093 
to allow Lessie to "compose" himself, Lessie asked, "[c]an I make a phone call to my dad?" Deveney replied, "Yes, you can. I'm going to bring a cell phone into you and you can use it. In fact you can use it while we're taking the break okay. Do you have the number or do you want me to bring you the number . . .?" When Lessie said he needed the number, Detective Govier told him "[o]kay, we'll be right back."
 After a long pause, Lessie asked to use the bathroom and Deveney advised him that they were getting him "a Nexte|?, a phone, we're charging it up so you can call your dad in privacy. Okay." After another pause, Deveney told Lessie that while they were getting the phone ready, they were going to ask him a couple of quick questions before leaving him alone to have whatever conversation he wanted with his father. After getting clarification as to who was in the car with Lessie that day, that he was the only shooter, and a description of the events in reference to a diagram of the crime scene, Deveney told Lessie, "[o]kay. Let me go see what's going on with that phone. We got your number for your dad."
 Moments later, the detectives returned with the Nextel and attempted to call Lessie's father for him, but the number they had did not work. During that same time, when the detectives asked Lessie about the family members he had talked to about the shooting, Lessie said he had talked with his aunt, uncle, and dad. When a working number for his father could not be found, Lessie asked to call his cousin for his dad's number. The detectives then left Lessie alone to make his calls.
 The transcript reflects that during the first call, Lessie left a voice mail message for his father, telling him he was in jail and to call him back at that number as soon as he got the message. During the second call to an unidentified person, Lessie asked whether the person had heard from his dad and for his dad's phone number. After telling the person he was in jail for murder and explaining about some of the witnesses, Lessie told the person, "[b]ut I'm gonna talk to you later, I'm about to go try to get in contact with my dad." Lessie tried a third call but there was no answer.
 The transcript of the September 21, 2005 interview with Lessie at juvenile hall revealed that the detectives initiated that interrogation to obtain more details about the Vons incident and the shooting after again advising him of his Miranda rights and offering to notify his father of his next court date in Vista. Lessie expressly acknowledged he understood his rights and wanted to talk to the detectives. He also indicated he had talked with his father since their last interview. During the second interview, which lasted 45 minutes, Lessie described in fuller detail the people and events leading up to the shooting. Lessie maintained that the only reason he shot the gun at Seau was *Page 1094 
because he was scared and Turner was telling him to do it. Lessie felt sick when he heard that Seau had died and had called his dad to let him know about it. His dad had told him to turn himself in, but Lessie did not do so because he did not want "to go to jail for something [he] didn't want to do. . . ." Near the end of the interview, Deveney explained to Lessie that he would get his attorney the next day in court and later helped Lessie again get in contact with his father.
 After considering the evidence and arguments of counsel, which were basically directed to the questions of whether a violation of Welfare and Institutions Code section 627, subdivision (b) required suppression of Lessie's statements at the first interview and whether his request to call his father at that time was a per se invocation of his right to remain silent, the court denied Lessie's motion to suppress. In doing so, the court noted that although it shared some concerns with defense counsel about the delay in getting a telephone to Lessie after saying he wanted his dad called and wanted to be the one to make the call, which was "probably at a minimum a technical violation of this Welfare and Institutions Code provision," it disagreed that suppression was a remedy for that. Even though Hector, supra, 83 Cal.App.4th 228 did not directly deal with that statute, the trial judge found such post-Proposition 8 case "very instructive in saying that under federal law, the request for a parent simply is not a Miranda violation and should not result in the suppression of a statement. And I find that case controlling in this context. And under Hector, and the [United States] Supreme Court case . . . [Fare, supra, 442 U.S. 707], I just don't think the exclusionary rule is applicable in this context."
 Nor did the trial judge see "any tie-in whatsoever between the defendant's statement that he wants to talk to his father and theMiranda rights." The court specifically noted that Lessie had been read his Miranda rights, had said he understood them and had never said "anything close to, `I'd like to remain silent'; `I don't want to talk;' `can I get a lawyer' — anything that would be an invocation of his 5th or 6th Amendment rights."
 The court also found that in this unusual situation, where Lessie had been living with his aunt and uncle in Hemet and they had already been notified that he was in custody, the fact Lessie said he wanted his dad called in response to Deveney's initial inquiry of who else he wanted notified, and the message Lessie left during his first telephone call for his dad advising him he was in jail, without asking for any advice from him, was circumstantial evidence of Lessie's intent to have his father merely notified about his arrest and not an invocation of his rights. *Page 1095 
 The court also agreed with the prosecutor that its ruling denying Lessie's suppression motion "would go specifically to the [prosecution] motion [because] that addresses the same issue."
 DISCUSSION Lessie essentially asserts the trial court erred in denying his motion to suppress his statements from the interviews of September 20 and 21, 2005, because it failed to follow the binding law set out in Burton,supra, 6 Cal.3d 375, which was affirmed in People v. Rivera (1985)41 Cal.3d 388 [221 Cal.Rptr. 562, 710 P.2d 362], that a juvenile's request to speak to his parent constitutes an invocation of his self-incrimination privilege after which custodial interrogation must immediately stop. Alternatively, he claims that even under the totality of the circumstances test of Fare, supra, 442 U.S. 707 and Hector, supra,83 Cal.App.4th 228, upon which the court relied, there was insufficient evidence to support the conclusion that he did not invoke his rights to remain silent and to speak with an attorney by asking to talk with his father at the first interview. We reject his contentions.
 It is well established that "[i]n considering a claim that a statement or confession is inadmissible because it was obtained in violation of a defendant's rights under [Miranda], we accept the trial court's resolution of disputed facts and inferences, and its evaluation of credibility, if supported by substantial evidence. [Citation.] Although we independently determine whether, from the undisputed facts and those properly found by the trial court, the challenged statements were illegally obtained [citation], we `"give great weight to the considered conclusions" of the lower court that has previously reviewed the same evidence.' [Citations.]" (People v. Wash (1993) 6 Cal.4th 215, 235-236
[24 Cal.Rptr.2d 421, 861 P.2d 1107].)
 Generally, under both federal and state law, a court must look at two issues to determine whether a defendant has voluntarily, knowingly, and intelligently waived Miranda protections. "First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the `totality of the circumstances surrounding the interrogation' reveals both an uncoerced choice and the requisite level of comprehension may a court properly conclude that theMiranda rights have been waived. [Citations.]" (Moran v. Burbine (1986)475 U.S. 412, 421 [89 L.Ed.2d 410, 106 S.Ct. 1135].) A defendant may make an effective implied waiver of Miranda rights by acknowledging that he understands them and then proceeding to answer questions. (People v.Whitson (1998) 17 Cal.4th 229, 250 *Page 1096 
[70 Cal.Rptr.2d 321, 949 P.2d 18] (Whitson); People v. Sully (1991)53 Cal.3d 1195, 1233 [283 Cal.Rptr. 144, 812 P.2d 163].)
 In Hector, supra, 83 Cal.App.4th 228, the defendant argued, as here, that his request to talk to a parent, there his mother, "`was a clear invocation of his right to remain silent which required questioning to immediately cease and made his subsequently given confession inadmissible.'" (Id. at p. 234.) In disagreeing, the court in Hector
examined the holding of Burton, supra, 6 Cal.3d 375, on which Lessie relies, and noted that eight years later, the United States Supreme Court in Fare, supra, 442 U.S. 707, concluded that, contrary to the holding of our Supreme Court, which was based on Burton, a minor's request for his probation officer during a custodial interrogation did not constitute a per se invocation of the juvenile's Fifth Amendment rights. (Hector,supra, 83 Cal.App.4th at pp. 234-235.) Rather, the high court concluded, "`the determination whether statements obtained during custodial interrogation are admissible against the accused is to be made upon an inquiry into the totality of the circumstances surrounding the interrogation, to ascertain whether the accused in fact knowingly and voluntarily decided to forgo his rights to remain silent and to have the assistance of counsel. [Citation.]' [Citation.] When determining whether a juvenile's waiver is voluntary, courts should consider the juvenile's `age, experience, education, background, and intelligence, and . . . whether he has the capacity to understand the warnings given him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights. [Citation.]' [Citation.]" (Id. at p. 235.)
 The court in Hector further considered the passage of Proposition 8, which added section 28, subdivision (d) to article I of the California Constitution, In re Lance W. (1985) 37 Cal.3d 873, 896
[210 Cal.Rptr. 631, 694 P.2d 744], and People v. Peevy (1998) 17 Cal.4th 1184, 1188
[73 Cal.Rptr.2d 865, 953 P.2d 1212], before concluding the question of whether a minor's claim that his request to speak to his parent was an invocation of his Miranda rights must be considered under the totality of the circumstances test set forth in Fare, supra, 442 U.S. 707. (Hector,supra, 83 Cal.App.4th at p. 235.) The court in Hector additionally noted that contrary to the arguments of the juvenile there, that the holding ofBurton was actually congruous with the totality of the circumstances test of Fare. (Hector, supra, 83 Cal.App.4th at p. 237.) "We do not doubt that a juvenile's request to speak to his or her parent must be considered as an indication that the minor wishes to invoke his or her Miranda rights. However, Burton does not set forth a per se rule; it does not state that whenever a juvenile asks to speak to his or her parent, interrogation must cease. Instead, a juvenile's request to speak to a parent must be construed as an invocation of his or her Fifth Amendment privilegesunless there is `evidence demanding a contrary conclusion.' [Citation.] Thus, application of the Burton rule requires consideration of the circumstances *Page 1097 
surrounding the minor's request. Viewed in this way, the rules of[Burton] and [Fare] are not irreconcilable." (Hector, supra, at p. 237, original italics.)
 We agree with the analysis and conclusion in Hector, supra,83 Cal.App.4th 228, that since the adoption of Proposition 8, the federal standard is to be applied to a minor defendant's claim that his or her statements were elicited in violation of Miranda and that the totality of the circumstances test of Fare is reconcilable with the rule set forth inBurton, supra, 6 Cal.3d 375. Moreover, our Supreme Court in People v.Lewis (2001) 26 Cal.4th 334 [110 Cal.Rptr.2d 272, 28 P.3d 34], has reaffirmed the application of this test to waivers of rights by minors (Id. at p. 383), and, while not reaching the exact issue here presented regarding whether the minor's request to speak to a parent was an invocation of his Fifth Amendment right, the court recognized bothBurton and Hector as relevant authority for such issue when properly raised. (Lewis, supra, at p. 385.) We believe Lewis is fully supportive of the conclusion that with regard to claimed violations of federal constitutional rights under Miranda, the totality of the circumstances test of Fare is compatible with the application of rules under Burton andFare as explained in Hector. Therefore, contrary to Lessie's assertion otherwise, the trial court here did not ignore the law set forth inBurton. Rather, it properly applied the federal law required after the passage of Proposition 8 based on the totality of the circumstances surrounding Lessie's first custodial interrogation to deter-mine whether he was invoking his Miranda privileges by saying he wanted his father notified and wanted to be the one to call him before being admonished about his rights and by actually asking to talk to his father near the end of the interview.
 Moreover, on this record, we conclude that the trial court did not err in determining that Lessie's statements during his September 20 and 21, 2005 interviews were admissible. We have reviewed the transcripts of those custodial interrogations as well as the testimony of Deveney at the hearing on the countermotions to admit and suppress Lessie's statements. The totality of the circumstances, including Lessie's age, intelligence and experience, lead us to conclude that he did not invoke his Miranda
rights, but instead impliedly waived them. Although Lessie was 16 years old at the time of the interviews, he had completed the tenth grade and, at the time of his arrest, was on probation and essentially on the run so he would not have to face being in custody a second time. Because of such earlier dealings with the law, we may presume that Lessie was not naive or inexperienced with respect to police procedures.
 The record shows that after Deveney provided full and adequate admonitions to Lessie, he answered "yeah" to each one. Because there was no evidence that Lessie lacked sufficient intelligence to understand his rights and *Page 1098 
the consequences of giving them up, his voluntary responses to the subsequent questions asked of him without hesitation affirmatively evidences that he understood his Miranda rights and impliedly waived them. Lessie's willingness to speak with the detectives is readily apparent from the transcripts of the interviews and nothing about those interrogations suggests the detectives resorted to any physical or psychological pressure to elicit statements from him. (See Whitson, supra,17 Cal.4th at pp. 248-249.) Lessie does not challenge the voluntariness of his statements.
 Although, the trial court found that the detectives technically violated the notification statute of Welfare and Institutions Code section 627, subdivision (b) by not providing a telephone to Lessie to call his father before a break near the end of the interview when he finally actually asked to talk with his father, it also found that such technical violation was but one factor to consider in this unusual case where Lessie was arrested at his aunt and uncle's home in Hemet and they were already "notified" of where and why he was being taken for confinement. We agree and find, as the trial court did, that Lessie's responses to Deveney's questions of who else he wanted notified and whether he wanted to be the one to call his father, were merely circumstantial evidence of Lessie's intent to have his father notified about his arrest and not an invocation of his Miranda rights.[6] Even after Lessie actually did ask whether he could talk to his father, he still did not hesitate to answer questions while the detectives sought to get him a charged cell phone to make his calls. At no time did Lessie refuse to answer any questions, request an attorney or say he would not answer any questions until after he talked to his father. Under these circumstances, Lessie's request to talk to his father did not demonstrate an intent to invoke his rights at the first interview.
 Because Lessie's challenge to the admissibility of his statements at the second interview on September 21, 2005, is premised upon a finding that he had invoked his right to counsel at the first interview by asking to talk with his father, such assertion necessarily fails.
 In sum, on this record, the trial court did not err in concluding Lessie had not invoked his Miranda rights and that his statements at the two interviews were admissible. *Page 1099 
 DISPOSITION
The judgment is affirmed.
McDonald, J., and McIntyre, J., concurred.
[1] All statutory references are to the Penal Code unless otherwise specified.
[2] The trial court declared a mistrial on a gang allegation under section 186.22, subdivision (b)(1) when the jury said it was hopelessly deadlocked on whether Lessie had committed the murder "for the benefit of, or at the direction of, or in association with any criminal street gang with the specific intent to promote or further or assist in any criminal conduct by gang members. . . ."
[3] Although the People originally asserted Lessie was improperly relying on the transcript of the police interview on September 21, 2005, for some of his contentions on appeal because it was not entered into evidence or transcribed by the court reporter, the People subsequently filed a supplemental letter brief conceding they were wrong.
[4] Welfare and Institutions Code section 627, subdivision (b) states, in pertinent part: "Immediately after being taken to a place of confinement . . . and, except where physically impossible, no later than one hour after he has been taken into custody, the minor shall be advised and has the right to make at least two telephone calls from the place where he is being held, one call completed to his parent or guardian, a responsible relative, or his employer, and another call completed to an attorney."
[5] Although the parties and court at the hearing only concentrated on the circumstances of the first interview, the court noted at the beginning of the hearing that it had reviewed the parties' pleadings, which included as exhibits both of the interviews on September 20 and 21, 2005.
[6] Contrary to Lessie's representation on appeal, he did not specifically ask to call his father before he was read his Miranda rights. As noted earlier, he merely answered Deveney's questions about who else should be notified and whether he wanted to be the one to call his father. Although the court found a technical violation of the notification statute due to the delay in getting the telephone for Lessie, it did not make any finding that the officers were willful in that violation. *Page 1100